# MICHAEL THOMAS SKINNER *v.* STATE OF MARYLAND

[No. 529, September Term, 1971.]

*Decided August 10, 1972.*

The cause was argued before MORTON, THOMPSON and MOYLAN, JJ.

*Thomas L. Lilly* for appellant.

*Gilbert Rosenthal,* Assistant Attorney General, with whom were *Francis B. Burch, Attorney General, Fulton P. Jeffers, State's Attorney for Wicomico County, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Stuart E. Hirsch, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Even the most conscientious police find it difficult to please convicted defendants. The almost universal plaint, following a successful warrantless search of an automobile, is that the police should have immobilized the car

and then obtained a warrant for its search. In the case at bar, they did just that. Unpropitiated, the appellant, Michael Thomas Skinner, still manages to complain.

At his trial before Judge William Travers and a jury in the Circuit Court for Wicomico County, following removal from Baltimore County, the appellant was convicted of 1) receiving stolen goods, 2) possession of heroin, 3) possession of controlled paraphernalia and 4) the keeping of an automobile as a common nuisance for the sale and distribution of controlled dangerous substances. He raises eight contentions going to the validity of those convictions, the first of which charges error in the nonsuppression of inculpatory evidence unconstitutionally seized from his automobile.

The search is constitutionally unassailable. With scrupulous regard for their suspect's 4th Amendment protections, the Baltimore County Police did more than they were required to do. Their effort, in terms of its constitutionality, is like Portia's quality of mercy, "twice blest."

Sometime during the night of August 5-6, 1970, a breaking and entering was perpetrated at S & M Contractors, located at 2207 East Joppa Road in the Parkville area of Baltimore County. Stolen were a checkwriter and 759 printed payroll checks, some drawn upon the Equitable Trust Company and some drawn upon the Mercantile Safe Deposit and Trust Company. Both banks were immediately notified of the numbers of the stolen checks. The Baltimore County Police were furnished the full particulars of the crimes on the morning of August 6.

At 9:45 a.m. on August 7, the manager of the Satyr Hill branch of the Equitable Trust Company spotted four of the stolen checks as they were pressed upon one of his tellers for cashing. When the white male who was attempting to cash the checks was asked to "wait a minute," he instead ran out of the bank and shouted to a driver of a 1962 white Chevrolet Nova convertible, bearing Maryland license tags HT 3557, to "take off." The car took off. It drove north on Satyr Hill Road and turned east on Joppa Road where it stopped to pick up the man who had issued the warning. The car was last seen driving eastbound on Joppa Road. All of this information was

reported to the Baltimore County police at 9:52 a.m. An immediate radio alert was broadcast, describing both the car and its occupants.

Officer Woodrow Klein, assigned to the Fullerton district, heard the broadcast. He knew the appellant. He had prior knowledge that the appellant possessed an automobile matching the description given in the radio alert. At 9 a.m. that morning, he had seen the appellant and another white male sitting in the appellant's car on the parking lot of the Parkville Senior High School. Within two minutes of hearing the police broadcast, he observed the car, driven by the appellant and also occupied by another white male who matched the description given in the broadcast, pull onto the parking lot of the Chapel Manor Apartments. Officer Klein approached the appellant and his companion, Jack McVeigh, and asked them to accompany him to the Parkville Police Station. They agreed to do so, after requesting and receiving permission to lock the car. Officer Klein did not at that time place them under arrest. They were arrested later at the Parkville Police Station.

It is beyond dispute that at the moment when Officer Klein saw the appellant's automobile pull onto the parking lot of the Chapel Manor Apartments, he (and through him his police colleagues) had probable cause to believe that the automobile contained fruits, instrumentalities and evidence of crime. We are further satisfied that the exigency of the situation would have justified an immediate warrantless search of the automobile there upon that parking lot. *Carroll v. United States,* 267 U. S. 132; *Bailey v. State,* 15 Md. App. 83. Far from derogating from the exigency of the circumstances, the non-arrest of the appellant and McVeigh compounded that exigency. It increased the peril that the automobile might be moved or its contents removed. Those exigent circumstances would have justified, in the alternative to the immediate search upon the parking lot, the seizure and removal of the car to a police garage for a more convenient warrantless search in such safer haven. *Chambers v. Maroney,* 399 U. S. 42; *Coolidge v. New Hampshire,* 403 U. S. 443.

Notwithstanding constitutional justification for im-

mediate warrantless action by way of either an immediate search or a seizure and removal to be followed by a later search at the police station, the police exercised forbearance. Officer Klein summoned the assistance of Officer Harry Owens and had Officer Owens maintain a passive surveillance over the automobile until Officer Klein returned from the Parkville Police Station. No one, including the police, entered the automobile, put anything into it or took anything from it. When Officer Klein returned to relieve Officer Owens, he called for a tow truck and had the automobile removed to police headquarters. Even there, no one entered the automobile. Officer Klein reported all of his information to Officer Wayne Ross, who combined it with all other knowledge bearing upon this crime in the hands of the Baltimore County Police Department and recited it in an application for a search warrant for the automobile which was submitted to Judge Lester L. Barrett, the Chief Judge of the Circuit Court for Baltimore County. Judge Barrett issued the warrant. Only then was the appellant's automobile entered and searched. The search turned up the evidence which led to the convictions at bar.

The same probable cause that would have justified the warrantless search of the automobile upon the parking lot also justified the issuance of the search warrant. The validity of the warrant is not contested. The appellant rather claims that the warrantless seizure of the automobile prior to the issuance of the warrant taints the entire proceeding. We hold that he is in error in that contention upon either of two independent grounds.

Ignoring for the moment the justification for warrantless action and analyzing the search exclusively within the framework of the warrant, that search warrant which authorized the entry into the vehicle in the police garage would also have authorized the entry into the vehicle back on the parking lot of the Chapel Manor Apartments. The appellant makes no showing nor even a contention that the automobile would somehow have been removed from the parking lot and therefore unavailable for the execution of the search warrant but for its prior seizure by the police. In that factual context, even if the seizure had been unwarranted, it would not ap-

pear to have worked any prejudice to the appellant. There is no suggestion that the police could not have executed the search warrant just as effectively and with just as much damage to the appellant's cause even though they might have had to travel a few blocks farther and consumed a few more minutes before making that execution. For the appellant even to urge the likelihood of prejudice is to urge in the same breath the existence of exigency.

It is quite clear that since the police could have searched the automobile without a warrant in the first instance or could have seized it without a warrant and removed it to the police garage for a subsequent warrantless search in the second instance, the justification for the mere seizure not followed by a warrantless search is subsumed within the larger justification. The search of the appellant's automobile was constitutional by virtue of the warrant; it was constitutional because of the combination of probable cause and exigent circumstances, even absent a warrant.

The appellant claims that his conviction under a count charging him with receiving stolen goods of the value of $100 or more is fatally defective because the only testimony with respect to the value of the stolen checkwriter was that it was three years old and that its initial purchase price was $199.50. Although we are by no means certain that a jury would not be permitted to infer that a functioning piece of office equipment had not depreciated more than 50% in three years, the point is academic in its present posture and need not be decided. The appellant's sentence of one year for the receiving conviction was well within the maximum sentence of three years permitted even for receiving stolen goods of a value of less than $100. As we held in *Jackson v. State,* 10 Md. App. 337, 347, "there is only one offense of receiving stolen goods and not two separate crimes, one of receiving goods to the value of $100 and upwards and another of receiving goods under the value of $100. It is not a question of a greater or lesser crime for there is only one crime."

It is true that since the enactment of Chapter 628 of

the Acts of 1966, the receiving of stolen goods of the value of $100 or upwards has been designated a felony, where the receiving of stolen goods of a lesser amount remains, as it was at the common law, a misdemeanor. In the case at bar, as in *Jackson,* the operative adverb used in the indictment was "unlawfully." Under Maryland Rule 712 b, the use of "unlawfully" shall serve to cover the cases of both felony and misdemeanor. In *Jackson* again, as in the case at bar, the proof established the receiving of goods of the value of less than $100 under a count charging the receiving of goods of the value of $100 or upwards. In upholding the validity of that conviction, we said, at 347-348:

> "That the goods proved to be received were of a value of under $100 simply authorized a maximum term of imprisonment of 3 years rather than 10 years and made the appellant a misdemeanant rather than a felon, important considerations, but not going to the validity of the conviction. The indictment set out the circumstances necessary to constitute the offense of receiving stolen goods which was all that was required. *Henze v. State, supra,* at 335. . . . The value of the goods is not an element necessary to constitute the offense; it did not have to be alleged nor proved as alleged any more than it is necessary to allege in the indictment the name of the thief or the person from whom the property is received. . . . Of course, the State must prove the value of the goods received to establish the punishment authorized and the classification of the offense."

It follows from our decision to treat the case at bar as one in which the proof did not establish the value of the goods received as having been $100 or upwards that the appellant not only be freed of any liability to an enhanced sentence (There was no enhanced sentence upon this count.), but also that he be freed of any collateral disabilities flowing from his designation as a felon rather than a misdemeanant. Our mandate shall so reflect.

Both the appellant's contention that the prosecution of a narcotics addict for the possession of drugs and/or paraphernalia represents cruel and unusual punishment and his contention that the court below committed error in denying his Motion for a Judgment of Acquittal and in denying his Motion for a New Trial are based upon his theory of so-called "pharmacological duress." Suffice it to say that the appellant's ingenious doctrine of "pharmacological duress" is not recognized in the law of this State, and we are not persuaded to adopt it judicially. The appellant's reliance on *Robinson v. California,* 370 U. S. 660, is misplaced. As the Court of Appeals pointed out in *Murray v. State,* 236 Md. 375, addiction is no crime in Maryland and an addict is not prosecuted or punished for his mere status. See also *Nutter v. State,* 8 Md. App. 635.

In oral argument, the appellant concedes that the contention contained in his brief to the effect that the trial court gave an erroneous definition of insanity to the jury was based upon a mistaken reading of the charge. He now acknowledges that the definition given was the correct one.

The appellant contends that he should have been entitled to the services of an independent psychiatrist of his choice at State expense. All that the law requires is that a defendant, upon his plea of not guilty by reason of insanity, be provided with an impartial and competent psychiatrist at the State's expense. That was done by making available to the defendant the impartial and competent psychiatric staff of the Clifton T. Perkins State Hospital. *Gaither v. State,* 13 Md. App. 245; *Brown v. State,* 14 Md. App. 415.

The appellant, on his own motion and not through counsel, raises an additional contention that he was denied genuine and effective representation. The only issue before the trial court in this regard was a pretrial motion by the appellant to have his court-appointed counsel dismissed. The motion was denied. The issue of genuine and effective representation at the trial itself not having been raised below and no evidentiary hearing having been held thereon, there is nothing properly before

us for review. Maryland Rule 1085. *Boswell and Poe v. State,* 5 Md. App. 571, 582-583; *Gatewood v. State,* 13 Md. App. 317, 324-325.

Under the fourth count, the appellant was convicted of keeping his automobile as a common nuisance for the purpose of keeping or selling narcotic drugs, in violation of Article 27, Section 286. The only evidence against the appellant, in this regard, was that the contraband drugs and paraphernalia were found in his automobile on the single day when it was searched. The only question before us is whether the keeping and maintaining of a "common nuisance" under Section 286 (a) (5) contemplates that the offense shall be of a continuing or habitual character or not. Although we have dealt with the statute on several occasions, we have never squarely interpreted its terms in this regard. In *Killie v. State,* 14 Md. App. 465, we posed the question but declined to answer it, at 474:

> "The appellant argues that the evidence at bar did not show that the proscribed conduct in his home was of a 'recurrent' or 'repeated' nature. He looks to *Ward v. State,* 9 Md. App. 583, 593, and *Beard v. State,* 71 Md. 275, as support for his proposition that a 'common nuisance' within the contemplation of Section 286 (a) (5) need be a place 'habitually resorted to' for unlawful purposes or 'habitually kept.' Both *Ward* and *Beard,* however, were dealing with the common law offense of keeping a disorderly house.
> It is not, in the factual posture of this case, necessary for us to decide whether the use of the phrase 'common nuisance' in Section 286 (a) (5) or the use of the phrase 'which is resorted to' contemplate that the offense must be of a continuing or habitual character, analogous to the offense of keeping a common law disorderly house. We need not decide the question here, because the evidence would support the conviction even if more than a single 'resort' to the house for unlawful activity were required."

In dealing with the question obliquely in *Kane v. State,* 12 Md. App. 466, however, we indicated implicitly that the offense was of a recurring or continuing character. In *Kane* we were dealing with the question of whether the trial judge had committed error in admitting evidence of other crimes. The trial judge had deemed such evidence relevant to the charge of maintaining a common nuisance. We affirmed his actions, relying primarily on *Ward v. State,* 9 Md. App. 583. Although *Ward* was dealing with the common law offense of keeping a disorderly house, it was implicit in our reliance upon it in *Kane* that "common nuisance" under the statute carried the same connotations as did "common law disorderly house." In *Berlin v. State,* 12 Md. App. 48, we reversed a conviction for maintaining a common nuisance under the statute where the evidence showed unlawful activity only on a single day. Although in *Berlin* we relied again directly on *Ward,* it was implicit in our holding that we were attributing to the words "common nuisance" under the statute the meaning which those and similar words had at the common law.

In *Rosenberg v. State,* 12 Md. App. 20, we pointed out, of course, that the common law misdemeanor of "common nuisance" was distinct from the statutory felony of "common nuisance" under Section 286. In terms of the continuing and recurring character of the offenses, however, we here make explicit what is already implicit in our decisions in *Berlin* and *Kane*—that the two offenses are of an identical nature.

Indeed, no other reading of the legislative intent is tenable. The operative verbs of the acts proscribed are "keep" and "maintain." *Webster's Third New International Dictionary* (unabridged) gives as the pertinent definition of "keep": "conduct, manage, carry on (as in, 'keep a business' or 'keep a small tearoom')." It gives as the pertinent definition of "maintain": "to provide for, bear the expenses of, support (as in, 'two rooms, with 145 beds, are maintained')." Section 286 goes on to define "common nuisance" not as "any place where a drug abuser *administers* controlled dangerous substances or a place which someone *uses* to manufacture, etc." but

rather as "any place . . . which *is resorted to* . . . or which *is used* . . ." According to accepted usage, the grammatical structure is significant. The employment by the Legislature of "is" in both instances as a passive-voice auxiliary followed by past participles indicates continuing or progressive action. *Webster* also provides as the pertinent definition of "resort": "to betake oneself: repair; esp: to go frequently, customarily, or usually." "Repair" is defined, in turn, as "to go habitually."

The adjective "common" and the phrase "common nuisance" are, moreover, accepted words of art at the common law. The whole fraternity (or sorority) of common vagrants, common brawlers, common scolds, common nightwalkers, common drunkards, common prostitutes and common gamblers share the characteristic that their offenses are of a recurring and habitual nature.[1]

The very thorough analysis of the common law misdemeanor of keeping a disorderly house by Chief Judge Murphy in *Ward v. State, supra,* 585-587, spelled out not simply that the offense had to be of a recurrent or ha-

---

1. Common scold:

A woman does not necessarily become a common scold by scolding on occasion. It is the habit of scolding, resulting in a common or public nuisance which constitutes the crime. *Baker v. State,* 20 A. 858 (N.J.).

The offense of being a common scold does not consist in a single act, or a number of single acts, but in a habitual course of conduct. 15 Am.Jur.2d, *Common Scold,* § 2.

Common brawler:

A "common brawler" is a person of a habitually quarrelsome, noisy and wrangling nature. The element of continuity is essential and it must be established that there was a habit or practice of such conduct on the part of the defendant. *State v. Reynolds,* 243 Minn. 196.

Common nightwalker:

A "common nightwalker" is one whose habit is to be abroad at night for the purpose of committing some crime, of disturbing the peace, or doing some wrongful or wicked act. *State v. Dowers,* 45 N. H. 543.

The offense consists not of particular acts but of a habitual practice evidenced by a series of acts. *State v. Russell,* 14 R. I. 506.

It was made a crime by the statute 5 Edw. III c. 14 (1341) and proscribes the habit of being abroad at night bent upon nuisance or mischief.

Common vagrant:

*Perkins on Criminal Law (2d Ed.),* at 430, points out that the "common vagrant" was a repeater. In an early English case it was pointed out that while a vagrant was not indictable as such under the law of that time, yet if he repeated after having once been judged a vagrant he could

bitual nature, but also that it was one variety of what was designated as a "common nuisance" at the common law. The conclusion that the continuing nature of the offense was a necessary element of the crime of keeping a disorderly house was drawn in large measure from the showing that it was a "common nuisance." After equating the two, *Beard v. State,* 71 Md. 275, said:

> "* * * The offense is that of a common nuisance, and it is necessary that the indictment should contain facts to show that a common nuisance has been created or permitted. This is done by allegation of such facts as show that the traverser maintains, promotes, or continues, what is noisome and offensive, or annoying and vexatious, or plainly hurtful to the public, or is a public outrage against common decency or common morality, or which tends plainly and directly to the corruption of the morals, honesty, and good habits of the people; * * *." (page 276)
>
> "* * * The crime consists in the keeping of the house as a place of habitual or common resort of people of evil name and fame, and of dishonest conversation, there to consort together, thus affording opportunities for and temptations to the indulgence of their bad habits and passions, to the evil example and scandal of the neighborhood. * * *" (page 282)

The form of the indictment for the keeping of a disorderly house, approved by *Hochheimer* (2d Ed.), Section 311, and still in use in many Maryland jurisdictions, included the words of conclusion "to the common nui-

---

"be indicted as a common vagrant." *Queen v. Branworth,* 87 Eng. Rep. 989 (1704).

Common prostitute:
Statutes in Iowa and Mississippi outlaw "common prostitutes."

Common drunkard:
Outlawed by statutes in Alabama, Arizona and Florida.

Common gambler:
Statutes in Florida and Mississippi outlaw "common gamblers." Similar statutes in Alabama and Wisconsin refer to "professional gamblers" and an Iowa statute refers to "habitual gamesters."

sance of all the people." [2] See *Jackson v. State,* 176 Md. 399.

Sir William Blackstone in 4 *Commentaries on the Laws of England* deals with "Common nuisances" at 166-168. He equates "common nuisance" with "public nuisance." His catalogue of the establishments and events qualifying as "common nuisances" implies the ongoing nature of the misbehavior:

> "All disorderly inns, or ale-houses, bawdy-houses, gaming-houses, stage-plays unlicensed, booths and stages for rope-dancers, mountebanks, and the like, are public nuisances, and may upon indictment be suppressed and fined."

*Webster* defines "common" as "known to the community; esp.: notorious as an accustomed general vexation (a common thief) (punished as a common scold) (maintaining a common nuisance)."

Other jurisdictions that have utilized the phrase "common nuisance" in their statutes have interpreted it as retaining its common law characteristic of being a recurring offense. "Common nuisance" as defined in the Volstead Act (implementing Prohibition) implied a more or less continuous practice or habit of selling intoxicating liquor on the premises, and a single sale, standing by itself, would not constitute a "common nuisance." *Schechter v. United States,* 7 F. 2d 881. The words "common nuisance" as used in the statutes of Indiana denote continuous or recurrent acts. *Gavin v. State,* 154 N. E. 872 (Ind.). The Maine statute declaring certain places to be "common nuisances" which were resorted to for the consumption of intoxicating liquors contemplated

---

**2.** The particular "common nuisance" set out in the statute, especially where it proscribes resort to it by drug abusers, appears to be little more than declaratory of the more general common law "common nuisance," which would certainly subsume the statutory proscription within its broad proscription against anyone "keeping and maintaining a common, ill-governed and disorderly house; and unlawfully causing and procuring certain persons, as well men as women, of evil name and fame and of dishonest conversation to come together in said house; and unlawfully permitting and suffering said persons to be in said house and there to remain, drinking, tippling, cursing, swearing, whoring, quarreling and misbehaving themselves to the common nuisance of all the people."

that the places be resorted to "commonly and habitually." *State v. Kapicsky,* 73 A. 830 (Me.).

We are persuaded that our Legislature, except insofar as it explicitly limited or expanded the definition, intended the phrase "common nuisance" to have its common law meaning. The recurring nature of the offense being an element of the crime under Section 286 (a) (5), the proof in the case at bar of a single day's violation was legally insufficient to permit the case to go to the jury. Accordingly, we reverse the conviction under the fourth count.

We also note that the sentence of five years under the conviction for possessing controlled paraphernalia is in excess of the four year maximum provided by Section 287 (e) for such an offense. Accordingly, we vacate the sentence and remand for resentencing.

> *Judgment affirmed as to count charging possession of heroin; judgment affirmed for misdemeanor of receiving stolen goods of the value of less than $100; judgment reversed as to count charging maintenance of a common nuisance; judgment affirmed as to count charging possession of controlled paraphernalia but sentence thereon vacated and case remanded for resentencing.*