584 A.2d 88

**Robert Lee McMILLIAN**

v.

**STATE of Maryland.**

**No. 260, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 16, 1991.

Harry Levy (Michael E. Kaminkow and Schulman, Treem, Kaminkow & Gilden, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and BISHOP and ALPERT, JJ.

ALPERT, Judge.

In *Ciriago v. State*, 57 Md.App. 563, 574, 471 A.2d 320 (1984), *cert. denied*, 300 Md. 152, 476 A.2d 721 (1984), we met the "Taj Mahal of blurts"; here, we are visited with the Gibraltar of consent searches. Robert Lee McMillian appeals to us from his conviction of maintaining a common nuisance building and conspiracy to distribute cocaine. He asks us to decide, *inter alia*, the question of whether a consent to search, which the police obtained after they illegally entered a private social club, was sufficiently purged of the taint of that prior warrantless entry and subsequent seizure of the premises and its occupants for us to consider the consent voluntary, and not an exploitation of that prior illegality.

## FACTS AND PROCEEDINGS

This case arose from the Baltimore City Police Department's investigation of the Foxes and Vixens Club (the Club), a private social club located at 1601 West Lexington Street, Baltimore, Maryland. The facts herein came to light during a three-day hearing on McMillian's motion to suppress the evidence that the police found during a consent search which followed their warrantless entry and seizure of the Club and its occupants.

At approximately 3 p.m. on December 29, 1988, Baltimore City Police Officer Thomas Rood spoke with a "reliable source" who told him that someone at the Club was selling drugs. The Western District Drug Enforcement Unit previously had received numerous complaints about the sale of controlled dangerous substances from the Club's location. Officer Rood proceeded to the Club to investigate.

The owner of a construction trailer, which was located nearby, gave Rood permission to use the trailer for covert surveillance of the Club. Officer Rood observed activities outside the Club and then radioed other officers to stop and arrest individuals who left the Club if Rood suspected them of criminal activity. Officer Rood initially observed eight or nine people standing outside the Club. He saw a black female exit the Club and give small objects, which he believed to be controlled dangerous substances, to five or six people. Rood ordered the other officers to stop those who had received the packages. When police officers stopped and arrested one of the recipients, LaTanya Lee, they recovered one glassine bag of a white powder substance.

Rood next testified that he saw numerous people go to and from the Club. He said that "[t]hey would come up and have conversation with one of the persons outside or they would ring the bell and have conversation. I would see currency exchanged. I would see the door close. Sometimes I would see a person standing in the doorway but I couldn't see ... [a] face. And I could see money go, come out of the [Club] or persons standing outside collect money, go to the door, ring the bell, talk with someone, money would go in, seconds later a small object would come out. These people would disperse." Rood saw such transactions occur twenty or thirty times.

As a result of these observations, he ordered the stop and arrest of two men as they walked away from the Club. The police recovered two glassine bags of cocaine from Bryant Livers and a glass vial containing a white powder substance from Darryl Lightner.

During this time, Rood also observed the people who stayed in and around the Club. At the suppression hearing, Rood identified McMillian and Curley Jackson as two men whom he had seen standing outside the Club. Rood did not see either of these men deal drugs, but considered them to be "players" because they stood outside the Club and directed people to the door, and could see the transactions take place from that vantage point. Rood further identified Arthur Lee Carter as the person who sold drugs to LaTanya Lee. Rood did not see Carter's face, but did see the arm of the person who gave the drugs to Lee. When Rood later entered the Club, he found Carter wearing the clothes that Rood earlier had seen on the arm of the person who delivered the drugs to Lee. No one else was wearing such clothing.

Throughout the surveillance period, Officer Rood was in radio contact with his supervisor, Sergeant Bert Ricassa, as well as Agent Timothy Devine, Sergeant John Slawinski, and Officers Clarence Smith and Clifton Mazer. The transcript of their conversations, which was introduced into evidence, showed extensive deliberation about the course of action that the officers should undertake based on their observations of the Club. They discussed the following options: (1) obtain a search and seizure warrant, (2) enter the Club and request that the owner or manager submit to a consent search, or (3) secure the premises while an officer obtained a search and seizure warrant. Rood's concern with the first option was that those involved would have concluded their drug sales or have vacated the Club by the time that the police obtained the warrant. He likewise vetoed the second option, believing that those inside the Club would "flush" the drugs before the police could enter.

Sergeant Ricassa then decided that it was "safe to write a paper" (search warrant) and instructed the officers to meet him at the police station. Agent Devine expressed concern that the officers would have to enter the Club that evening because those arrested had overheard the radio communications among the officers and might alert the others involved

in illicit activities at the Club. The officers convened their meeting at the police station at approximately 5:50 p.m., and it appears as though all of the officers withdrew from the surveillance for that hour-long meeting.

After discussing the case with his officers, Sergeant Ricassa decided that they would return to the Club and "secure the place, hold everybody there until we could type up a search and seizure warrant, ... unless we [could] get a consent to search form signed by either the manager or the people, person in charge of the premises." Although Ricassa believed that he had probable cause for a warrant to issue, he did not pursue a warrant prior to entry because he believed that "these dealers or these main players ... [would not be there] three to four hours or the next day after we ... [had] a search and seizure signed ... by a Judge." Rood testified that the officers also decided to "slip in" when one of the patrons knocked on the door and someone inside opened up the Club door.

At 7:05 p.m., a uniformed police officer, Officer Mazer, approached the Club door, waited until a patron rang the bell, and then, when the door opened, stepped in front of the patron and entered the Club. McMillian yelled "police" when he saw Officer Mazer and tried to close the door on him. Because the other officers were unable to make radio contact with Officer Mazer, they entered the Club. The officers found between twenty and twenty-five people rather than the three to five that they had expected to find. The officers detained these people and patted them down.

Although those in the Club were not under arrest, neither were they free to leave. The police determined that McMillian was the Club manager. McMillian then inquired whether Rood had a search warrant. Officer Rood advised McMillian that the officers had had the Club under surveillance for several hours and that they believed he was involved with drug transactions. McMillian stated that "he knew ... [the police] were coming. Rood explained that "[he] had come in to try to obtain a consent search from [McMillian]. If [McMillian] didn't want to give me a con-

sent search, that the officers would stay there and secure the premises. I would go into the station, type up a search and seizure warrant, and try to have—either a Judge would sign it or wouldn't sign it." When Rood asked McMillian why an elderly man like himself was involved with drugs, McMillian replied that he had to make a living somehow.

Rood testified that he neither threatened McMillian nor promised him anything when he requested the consent to search. McMillian signed a consent form five to ten minutes after the police entered the Club. The form included a statement that McMillian knew that he had the right to refuse the search.

The police then searched the Club, which consisted of a large room with a game board, pool table, and several poker machines; a second room with a large wooden picnic table; and a back room that appeared to serve as a small office in which untaxed liquor and cash was stored. The police found the following items during their search: (1) 9 glassine bags of cocaine in a garbage can, (2) 25 glassine bags of cocaine inside a Kool cigarette pack in the back room near a box of tiles, and (3) 25 glassine bags of cocaine in a manilla envelope located in the center of the room where people played cards. Officer Rood's expertise in narcotics law enforcement led him to conclude that the Club was a front for the distribution of controlled dangerous substances.

On March 1, 1989, the Grand Jury for Baltimore City charged McMillian with the following crimes: possession with intent to distribute cocaine, possession of cocaine, maintaining a common nuisance building, conspiracy to distribute cocaine, and conspiracy to possess cocaine with intent to distribute. The Grand Jury also charged co-defendants Curley Jackson and Arthur E. Carter with narcotics-related offenses, including conspiracy,[1] that related to the same course of criminal conduct alleged against McMillian.

---

1. The indictment count stated in relevant part that McMillian, Arthur Earl Carter, and Curley Jackson "unlawfully did conspire together and

McMillian filed a motion to suppress the evidence that the police found during the December 29, 1988 search. The Circuit Court for Baltimore City denied the motion. At the conclusion of the jury trial (the Hon. Thomas Ward, presiding), the jury acquitted Jackson and Carter of all charges. Although the jury acquitted McMillian of possession of cocaine with intent to distribute, possession of cocaine, and conspiracy to possess cocaine with intent to distribute, it convicted him of conspiracy to distribute cocaine and of maintaining a common nuisance building.

McMillian filed a motion for a new trial, challenging the trial court's denial of his motion to suppress the evidence as well as the jury's verdicts. The court denied the motion. We subsequently granted leave to file a belated appeal.

## ISSUES

On appeal, McMillian asks us to answer three questions:
I. Whether the trial court erroneously failed to suppress the evidence seized by police as a result of the warrantless search and seizure of the Foxes and Vixens Club?
II. Whether the trial court erroneously failed to grant McMillian's motion for new trial or, in the alternative, for judgment of acquittal of conspiracy to distribute cocaine?
III. Whether the trial court erroneously failed to grant McMillian's motions for judgment of acquittal and motion for a new trial or, in the alternative, for judgment of acquittal of maintaining a common nuisance?

## I.

The trial court denied McMillian's motion to suppress the evidence for three reasons. First, the court found that exigent circumstances existed because the police were convinced that "if the premises were not entered and secured, or commission [sic] to search effectuated, that both the

with each other and with certain other persons whose names are to the Jurors aforesaid unknown."

main players and the evidence would have disappeared." Second, the court found that McMillian's consent to search was voluntary because Officer Rood had obtained that consent "in a relaxed atmosphere devoid of any forced pressure or promises." Finally, the trial court relied on the Supreme Court's opinion in *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), for the proposition that the police officers had the authority to secure the Club to maintain the status quo and to prevent the destruction of evidence while they obtained McMillian's consent to search.

## A. SCOPE OF REVIEW

■ When a defendant alleges that the police have infringed upon his or her constitutional rights, we must make our own "independent constitutional appraisal." *Riddick v. State*, 319 Md. 180, 571 A.2d 1239 (1990); *Borgen v. State*, 58 Md.App. 61, 79, 472 A.2d 114 (1984). To do so, we must

> review[ ] the law and apply[ ] it to the peculiar facts of the particular case. When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give 'due regard to the opportunity of the trial court to judge the credibility of the witnesses,' as commanded by Md.Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider 'are limited to those produced at the suppression hearing, which are most favorable to the State as the prevailing party on the motion.'

*Riddick*, 319 Md. at 183, 571 A.2d 1239 (citations omitted).

## B. CONSTITUTIONAL LAW

■ The Fourth Amendment, as applied to the states through the Fourteenth Amendment, protects the privacy interests of individuals against *unreasonable* searches and

seizures.[2] *See* U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." [3] *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). The courts determine reasonableness by "balanc[ing] the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Maryland v. Buie*, —— U.S. ——, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990) (citations omitted).

■ Generally, "[a] warrantless search is *per se* unreasonable unless the government can demonstrate that it falls within one of a carefully defined set of exceptions to the fourth amendment's warrant requirement," *United States v. Munoz–Guerra*, 788 F.2d 295, 297 (5th Cir.1986), including those cases in which "the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979).

■■ In the event of illegal police conduct, the exclusionary rule serves as an individual's principal remedy. "The exclusionary rule prohibits introduction into evidence

---

**2.** The Fourth Amendment "applies equally to seizures of persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). "[A] person has been 'seized' within the meaning of the Fourth Amendment.... if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

**3.** At least one case has held that the police may secure a dwelling to prevent the destruction or removal of evidence while they obtain a search warrant, *see Segura v. United States*, 468 U.S. 796, 811, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984), and that such action does not "violate the Fourth Amendment's proscription against unreasonable seizures." *Id.* at 798, 104 S.Ct. at 3382. See discussion *infra.*

of tangible materials seized during an unlawful search...." *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472 (1988). Further, this prohibition extends to indirect as well as to direct evidence obtained through illegal police action. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963). It also is true, however, that "[w]hether the exclusionary sanction is appropriately imposed in a particular case ... is an 'issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984) (citation omitted).

■ Despite the prior illegal conduct, "[e]vidence may be admitted if [1] it has but an 'attenuated link' to the underlying illegality, [2] if it derived from a source independent of the illegal conduct, or [3] if the evidence would inevitably have been discovered absent the illegality." *Hamilton v. Nix*, 781 F.2d 619, 625 (8th Cir.1985), *aff'd*, 809 F.2d 463, *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987) (citations omitted).

### 1. *Exigent Circumstances*

■ Appellant contends that the trial court erred when it concluded that exigent circumstances existed, *i.e.*, the possibility of loss or destruction of evidence existed, which justified the warrantless entry and subsequent seizure of the Club and its occupants by the police. He argues that there were no exigent circumstances under the facts of this case. We agree with appellant.

In *Stackhouse v. State*, 298 Md. 203, 468 A.2d 333 (1983), the Court of Appeals addressed at length the meaning of exigency and when exigent circumstances sufficient to justify a warrantless search might exist. The Court noted that "[t]he meaning of exigency implies urgency, immediacy, and compelling need." *Id.* at 212, 468 A.2d 333.

Upholding warrantless searches based upon exigent circumstances involves two principal categories of cases: 'hot pursuit,' and destruction or removal of evidence. [ ] Where a warrantless search is based upon the destruction or removal of evidence the surrounding circumstances must present a specific threat to known evidence. For example, in *Thomas v. Parett*, [524 F.2d 779, 782 (8th Cir.1975)], the police knew that narcotics were on the premises and that several people were present. The police could not risk arresting people as they left separately.

*Stackhouse*, 298 Md. at 213–14, 468 A.2d 333 (citations omitted). "To justify the warrantless search the officers must reasonably believe that a strong likelihood exists that the removal or destruction of the evidence is imminent." *Id.* (citations omitted). After reviewing numerous Supreme Court cases, including *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the *Stackhouse* court concluded that the Supreme Court intended courts to construe narrowly the exception for exigent circumstances. "In the situation where the destruction or removal of evidence is urged as justifying a warrantless search, it must be a situation where there was an immediate, urgent, and compelling need for police action." *Stackhouse*, 298 Md. at 216, 468 A.2d 333. "[T]he burden of establishing exigent circumstances is on the State, and ... the facts and circumstances upon which the question of reasonableness depends must be viewed in the light of established fourth amendment principles." *Id.* at 217, 468 A.2d 333 (citations omitted).

In this case, the police officers observed the Club and its activities from about 3 p.m. until 5:50 p.m., at which time they returned to the police station to meet with Sergeant Ricassa. Although it is unclear from the record, it appears as though no police officers remained to watch the Club in the hour during which the officers held their meeting. It seems unlikely that Sergeant Ricassa would have directed

the officers to return to the police station for a meeting had the situation shown an "immediate, urgent and compelling need for police action." Thus, we must conclude that the police officers were not convinced that the situation as it existed between 3 p.m. and 5:50 p.m. was sufficient to justify a warrantless search and seizure.

Further, even if exigent circumstances had existed in that time period, those circumstances very well might have dissipated during that one hour gap in surveillance. The record is silent as to whether the police officers tried to determine that the previously observed activities still were in progress when they returned at 6:48 p.m. Because the record shows that Officer Mazer entered the Club at 6:52 p.m., we can only assume that the officers made no such determination. Thus, the police could not reasonably have believed that evidence was likely to be destroyed or removed because they could not know that there was any evidence at that time.

We hold that the trial court erred when it found that exigent circumstances existed under the facts of this case.

### 2. *Consent Searches*

Appellant contends that the trial court should have excluded the fruits of the consent search from evidence. He argues that his consent to search was not voluntary under the facts and circumstances of this case. He also contends that even if his consent was voluntary in the constitutional sense, the evidence still must be suppressed under the "fruit of the poisonous tree" doctrine because the evidence was insufficiently attenuated from the illegal entry and subsequent seizure of the premises and its occupants. To support his contention, appellant relies on LaFave's proposition that the fruit of the poisonous tree doctrine can extend to invalidate a consent which a court previously has determined to be voluntary. *See W. LaFave, Search and Seizure,* § 8.2(d), at 189–90 (1987).

In that section on which appellant relies, LaFave explains that the courts have taken different approaches to determining the admissibility of "physical evidence obtained by a purported consent [that was] given following some form of illegal police action...." *Id.* Some courts frame the question in terms of the " 'totality of the circumstances' " voluntariness test and ascertain "whether the prior illegality and the other circumstances resulted in coercion of the person who purportedly consented to the search." *Id.* Other courts frame the question as "whether the consent was a fruit of the prior illegality" under the " 'fruit of the poisonous tree' " doctrine developed in *Wong Sun.* *Id.* at 190. These courts then must decide " 'whether, granting establishment of the prior illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* LaFave points out that while the two tests overlap, they are not the same. Consequently, he believes that a court should admit evidence obtained by the purported consent only if it determines "that the consent was *both* voluntary and not an exploitation of the prior illegality." *Id.* (emphasis in original).

Under this analysis, LaFave is doubtful that a consent search ever can be " 'purged of the primary taint' " if a court finds that the consent was not voluntary after accounting for the prior illegality and other relevant factors. *Id.* He reaches this conclusion because he believes that the primary taint will remain so long as the prior illegality is a factor that enters the equation to determine whether the individual was coerced. *Id.* LaFave notes that a consent search which fails the voluntariness test because of a prior illegality also may be said to be a fruit of that prior illegality. *Id.* *He also believes, however, that the fruit of the poisonous tree doctrine can extend to invalidate even a consent that* was *voluntary.* *Id.* He contends that such a situation could occur if "pressure upon the person from the prior illegality is not so great that 'his will has been overborne' under the *Schneckloth* voluntariness rule [*see*

*Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) ], but yet it cannot be said under *Wong Sun* that his consent was 'sufficiently an act of free will to purge the primary taint.' " *Id.* at 190–91.

Those courts that apply the fruit of the poisonous tree doctrine—either alone or in conjunction with the "totality of the circumstances" voluntariness test—to determine the validity of a consent after a prior illegality have adopted for that purpose the Supreme Court's attenuation analysis in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[4] *See, e.g., People v. Odom,* 83 Ill.App.3d 1022, 39 Ill.Dec. 406, 404 N.E.2d 997 (1980). In *Brown,* the issue before the Court was whether a defendant's inculpatory statements, made after an illegal arrest, should have been excluded as the fruit of that illegality, or were admissible because the Miranda warnings sufficiently attenuated the taint of the arrest. *Id.* 422 U.S. at 591, 95 S.Ct. at 2255. The Supreme Court reversed the Illinois Supreme Court, holding that Miranda warnings, "alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Id.* at 603, 95 S.Ct. at 2261. In its opinion, the Court set forth those factors that courts should consider to determine "whether a confession is the product of a free will under *Wong Sun.*"

---

**4.** That analysis most often is used to determine the validity of inculpatory statements made after an illegal arrest. That is, courts use this approach to determine whether evidence obtained after an illegal arrest has been purged of the taint of that illegality. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). The Maryland Court of Appeals adopted the *Brown* attenuation analysis in *Ferguson v. State,* 301 Md. 542, 549, 483 A.2d 1255 (1984). In *Ferguson,* the Court of Appeals applied the attenuation analysis to determine "whether extrajudicial identification testimony is suppressible as the fruit of an illegal arrest." *Id.* at 549, 483 A.2d 1255. The Court of Appeals concluded that the extrajudicial identification testimony had to be excluded as the fruit of an unlawful arrest, but went on to hold that the in-court identification was admissible under the independent source exception to the fruit of the poisonous tree doctrine. *Id.* at 553–557, 483 A.2d 1255.

*Id.* "[F]or the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' " *Id.* at 602, 95 S.Ct. at 2261 (citations omitted). For a statement to be the product of a free will for fourth amendment purposes, a court must consider not only whether Miranda warnings were given but also "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2261–2262.

By applying both the "totality of the circumstances" voluntariness test and *Brown*'s attenuation analysis under the fruit of the poisonous tree doctrine, a court conceivably could conclude—as LaFave has postulated—that a consent which followed illegal police conduct was voluntary but yet invalid because the nexus between the illegality and the challenged evidence was insufficiently attenuated to dissipate the taint of that illegality.

We disagree with LaFave's contention that the fruit of the poisonous tree doctrine can extend to vitiate a consent to search which a court otherwise has determined to be voluntary. The Supreme Court has never modified or qualified its decision in *Schneckloth* to hold that a consent to search which is voluntary for fourth amendment purposes is valid *except* when a court determines that it is the fruit of the poisonous tree under *Wong Sun*. To conclude that a consent is voluntary, but then to find that it is tainted due to illegal police conduct and therefore invalid, seems to us to be incongruous. If a defendant knows that he has a choice, *i.e.*, to consent or to withhold consent, if he chooses to consent without coercion or duress, and if a court subsequently finds that consent to be voluntary in the constitutional sense, then we think that the consent resulted from " 'an intervening independent act of free will' " and " 'that [the consent] was ... sufficiently an act of free will to

purge the primary taint of [any unlawful conduct].' " *See Brown,* 422 U.S. at 598, 95 S.Ct. at 2259 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416).

There is support for this view in *State v. Wilson,* 279 Md. 189, 203, 367 A.2d 1223 (1977), where Judge Levine, speaking for the Court, stated that "[t]he illegality of a prior seizure, of course, does not automatically render evidence obtained by a subsequent consent search inadmissible, but it is a relevant factor to consider in determining the voluntary nature of the consent." *See also Ferguson, supra* note 4, in which—apparently for the first time since *Wong Sun*—the Court of Appeals recognized the *Brown* attenuation analysis.[5] We think that the way to analyze such cases

---

5. At first blush, *Dailey v. State,* 234 Md. 325, 199 A.2d 211 (1964), may seem to be in conflict with the *Wilson* dicta. In *Dailey,* the police found a tool kit and two keys in the pocket of a man's coat left at the scene of a burglary. The police suspected that the owner lived in the neighborhood because of numerous prior reports of burglaries or attempted burglaries in that area. From the appearance of the two keys, the officers reasoned that the one stamped "5" probably opened the door to a room while the other opened an outside door. This suggested that the keys might fit the doors of one of the twelve rooming houses in the area. The police tried the larger key in the outer doors of the rooming houses and eventually found one that it fit several blocks from the scene of the burglary. They entered and knocked on the door of room 5. When no one answered, they tried the key numbered "5" and opened the door. The defendant was in bed asleep. One of the officers picked up a loaded pistol that was lying on the nightstand. Another told the defendant to get out of bed. During the course of the conversation, the defendant admitted that he had left his coat at the scene. When the officer asked if they could search the room, the defendant agreed. The trial court convicted the defendant of breaking and entering a storehouse, and imposed a two year sentence.

On appeal, the defendant argued that his consent was not voluntary and that the evidence obtained during the consent search should be inadmissible. The Court of Appeals held that "the fact that the police were trespassers at the time of the alleged consent would make the evidence inadmissible." In so holding, the court distinguished *Armwood v. State,* 229 Md. 565, 185 A.2d 357 (1962) and the cases cited therein. Although the arrests in those cases were illegal due to lack of probable cause, the court found that the arrests were made on "neutral ground," *e.g.,* the police arrested Armwood in an alley, and that "the consent given was not the direct consequence or 'fruit' of a

wrongful act." Unfortunately, the Court of Appeals did not elaborate on this latter distinction.

Initially, we observe that *Brown* was decided in 1975, 12 years after *Dailey*, and thus the Court of Appeals did not have the benefit of the attenuation analysis. Further, we think that *Dailey* is inapposite because it is factually distinguishable from the instant case. First, the police in *Dailey* had no probable cause to believe that Dailey had committed the breaking and entering when they entered his apartment. By contrast, the police in this case had ample probable cause to believe that McMillian was involved in drug-related activities before they ever entered the Club. Second, the police entered Dailey's apartment. The police in the case *sub judice* entered a private social club. The fourth amendment protects people from unreasonable searches and seizures in those places in which they have a reasonable expectation of privacy. Because the fourth amendment prohibits unreasonable searches and seizures, rather than trespasses per se, a trespass becomes relevant only when it invades a defendant's reasonable expectation of privacy. Clearly, an individual's reasonable expectation of privacy reaches its zenith in the home. By contrast, business and commercial enterprises generally are not as private as a residence and "as an ordinary matter law enforcement officials may accept a general public invitation to enter commercial premises for purposes not related to the trade conducted thereupon." *United States v. Berrett*, 513 F.2d 154, 156 (1st Cir.1975). Although a club operated for a select clientele may not be public, "[t]he fact that the premises are maintained as a club with a membership policy is not conclusive in favor of the club. Failure to enforce limitations on admittance would warrant the conclusion that the persons operating the club had no reasonable expectation of privacy." *Commonwealth v. Cadoret*, 388 Mass. 148, 445 N.E.2d 1050, 1053 (1983). In the instant case, there was some evidence to indicate that although the Club was to be used only by members, that policy was not enforced and the Club effectively was open to members of the public. Given the fact that the Club was a business/commercial enterprise and its questionable enforcement of its membership policies, we think that McMillian had a lesser expectation of privacy than did the defendant in *Dailey*. · Finally, we think that the illegal police conduct in *Dailey* was far more egregious than that in the instant case. We already have noted that the police lacked probable cause when they entered Dailey's apartment. Their silent entry and presence upon Dailey's awakening surely created— and perhaps was calculated to do so—some degree of confusion, apprehension, and surprise. There is no indication that the police advised Dailey that he had a right to refuse the search. The fact that the items later admitted into evidence all were in plain view supports Dailey's contention that he merely acquiesced to authority as a consequence of the entry and the arrest. In contrast, the police in this case already had probable cause before they entered the Club. Further, they entered the Club with the int of requesting the manager consent to search or, in the event that the consent was not forthcoming, securing the premises while they obtained a search warrant. They never intended to search without a warrant or to coerce someone into a consent to search. In sum, we think that under the facts in *Dailey*,

is to apply the "totality of the circumstances" voluntariness test, using not only the factors that the Supreme Court set forth in *Schneckloth* but also those which it enumerated in *Brown*. By doing so, we can consider any prior illegality in our determination of whether the consent was voluntary without that impropriety invalidating an otherwise voluntary consent.

█ It is well-established that the police may conduct a warrantless search or seizure if they have an individual's voluntary consent to do so. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973). To determine whether a consent is voluntary, Maryland follows the "totality of the circumstances" standard that the Supreme Court established in *Schneckloth.* 412 U.S. at 226, 93 S.Ct. at 2047. "Consent that is coerced by threats or force, or granted only in submission to a claim of lawful authority, is not voluntary." *Doering v. State,* 313 Md. 384, 402, 545 A.2d 1281 (1988) (citing *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050). "Coercion that defeats voluntariness may be by explicit or implicit means, by implied threat or covert force." *Id.* (citing *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048). "The fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Likewise, "the absence of proof that [the defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance." *Id.* Age, intelligence, and lack of education are additional factors that courts may consider. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The voluntariness of a consent to search ordinarily involves the determination of a question of fact. *Gamble v. State,* 318 Md. 120, 125, 567 A.2d 95 (1989). It is the State that has the burden of proving that an individual freely and voluntarily consented.

---

the illegal entry in that case was exactly the type of "fishing expedition" that the fourth amendment was designed to protect against.

*United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *see also Doering v. State,* 313 Md. 384, 401, 545 A.2d 1281 (1988).

 As noted *supra,* we also believe that the *Brown* factors—"[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct," *id.* 422 U.S. at 603–04, 95 S.Ct. at 2261–62—are relevant in determining whether a consent to search that followed illegal police conduct was voluntary under the totality of the circumstances.

In this case, the record indicates that the officers entered the Club without invitation. There was no show of force when they entered the Club—they did so without their guns drawn. Officer Rood shortly determined that McMillian was the Club manager. Rood believed McMillian to be about 55 years old. When Rood approached him, McMillian asked whether the police had a search and seizure warrant. Rood escorted McMillian through the Club to the back room. Although he was not under arrest or physically restrained in any way, McMillian was not free to leave the Club. Several officers and civilians stood in the doorway between the large clubroom and the smaller back room during this time.

Rood told McMillian that the officers did not have a warrant—that they had entered the Club with the hope that they would obtain a consent to search. Rood advised McMillian that the police had observed activities in and around the Club for several hours, and that they believed that he was involved in drug transactions. McMillian indicated that "he knew ... [the police] were coming." Rood went on to explain that if McMillian chose not to consent, then the police would secure the premises and "try" to get a warrant. Rood did not say that the police would search the Club with or without a warrant. He also was careful not to convey the impression that the warrant was a *fait accompli*—he told McMillian that "either a judge would sign ...

[the warrant] or wouldn't sign it." Rood neither threatened McMillian with jail or arrest if he failed to consent, nor promised that those in the Club would be free to leave if he did so. Five to ten minutes after the police entered the Club, McMillian signed the consent authorization form, which stated that he had been informed that he had the right to refuse the search. Rood described McMillian as being "very relaxed" during this time.

Based on these facts, we hold that McMillian's consent to search was voluntary. Though the police were uninvited, there was "no force, no threat, no express command, no insistence on an actual or supposed legal right" to search the Club. *Gamble*, 318 Md. at 128–29, 567 A.2d 95. McMillian was not physically restrained nor was he under arrest. Five to ten minutes elapsed before McMillian signed the consent form. That time period was ` sufficient for the initial confusion and surprise from the officers' entry to dissipate but not so long that McMillian might have felt pressured into giving his consent. During that five to ten minute period, Officer Rood advised McMillian of his options in a straightforward manner without threats or promises. Rood explained that the entry was warrantless, that he sought McMillian's consent to search, that absent such consent, he would seek a warrant which a judge might or might not sign. McMillian's age and his query about a search and seizure warrant suggest a knowledgeable, experienced, and intelligent individual. Because he knew that the police needed a warrant, it therefore is not unreasonable to assume that he also understood his right to refuse the search. McMillian also appeared to know in advance that the police would appear on the premises. His consent was as solid as the Rock of Gibraltar. We hold that the trial court did not err when it concluded that McMillian's consent to search was voluntary and that it correctly denied McMillian's motion to suppress the evidence.

## II.

McMillian contends that the trial court erred when it failed to grant his motion for a new trial or, alternately, for

judgment of acquittal of conspiracy to distribute cocaine. He argues that the trial court should have granted one of these motions because the only evidence of a conspiracy to distribute cocaine which the State introduced at trial involved himself and his two co-defendants—Arthur Carter and Curley Jackson—both of whom the jury acquitted of conspiracy. As a result of these acquittals, McMillian argues that the jury should not have convicted him of conspiracy to distribute cocaine as a matter of law.

A criminal conspiracy is an agreement between two or more persons "to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988). From that principle follows "the well settled general rule that one defendant in a prosecution for conspiracy cannot be convicted where all of his alleged co-conspirators, be they one or more, have been acquitted or discharged under circumstances that amount to an acquittal." *Regle v. State,* 9 Md.App. 346, 351, 264 A.2d 119 (1970). The *Regle* court explained the rationale behind the rule:

> [I]t is illogical to acquit all but one of a purported partnership in crime; that acquittal of all persons with whom a defendant is alleged to have conspired is repugnant to the existence of the requisite corrupt agreement; and that regardless of the criminal animus of the one defendant, there must be someone with whom he confected his corrupt agreement, and where all his alleged co-conspirators are not guilty, a like finding as to him must be made. But 'It [sic] is only where one is convicted and another or others are acquitted, resulting in a repugnancy upon the record, that the convicted conspirator may be discharged.'

*Id.* at 352, 264 A.2d 119 (citations omitted).

The court went on to say that there were circumstances in which a single defendant could be prosecuted and convicted of conspiracy.

> Generally speaking, it would appear that so long as the disposition of the case against a co-conspirator does not

remove the basis for the charge of conspiracy, a single defendant may be prosecuted and convicted of the offense, even though for one reason or another his co-conspirator is either not tried or not convicted.

*Id.*

In that regard, the court pointed to *Adams v. State,* 202 Md. 455, 97 A.2d 281 (1953), *rev'd on other grounds,* 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954), in which it previously had held that it was proper for a jury to convict one defendant in a conspiracy case even though it did not convict any of the other conspirators so long as the evidence showed that a person (or persons) unknown to the jury was a party to the conspiracy. *Regle,* 9 Md.App. at 352, 264 A.2d 119; *see also United States v. Mosquera,* 779 F.2d 628, 630 (11th Cir.1986) (proper to convict a defendant of conspiracy with persons whose names are unknown or who have now been tried and acquitted *if* evidence is sufficient to establish the existence of such persons and of conspiracy); *Harris v. State,* 82 Md.App. 450, 457, 572 A.2d 573 (1990).

McMillian argues that the evidence which the State presented at trial was insufficient to show that there were "persons unknown," *i.e.,* persons other than Carter and Jackson, with whom he could have conspired.

▮ The record indicates that several individuals, other than Carter and Jackson, could have been parties to the conspiracy. First, Rood testified that he saw a black female exit the Club and distribute small objects to those waiting outside. Second, Rood described Bryant Livers' drug purchase. Rood testified that he saw the arm of the person who delivered drugs to Livers and that there was nothing distinctive about the clothing on the arm. By contrast, Rood noticed that the individual who delivered drugs to LaTanya Lee had clothing on the arm that Rood later recognized and relied upon to identify Arthur Carter. Further, Rood denied seeing Carter distribute drugs to anyone other than Lee, which suggests that the person who

delivered the drugs to Livers was not Carter but some other unknown person. Finally, Rood described the presence of an unknown man dressed in black. Rood saw him enter and exit the Club, saw him talk to those waiting outside the Club, and saw him observe the drug transactions that occurred. Rood testified that he initially thought the man in black was a dealer. He also testified, however, that he never saw the man carrying drugs; otherwise, he would have radioed the other officers to arrest him. The police did not find this man in the Club when they later entered it.

On appellate review, the appropriate standard to determine the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056 (1986). It is a function of the trier of fact to resolve conflicts in the evidence and to weigh the credibility of witnesses. *Colvin v. State,* 299 Md. 88, 112, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984); *Bryant v. State,* 49 Md.App. 272, 283–84, 431 A.2d 714, *cert. denied,* 291 Md. 772, 782 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

The trial court instructed the jurors on the elements of conspiracy. Armed with that knowledge and with the evidence described above before them, we believe that a reasonable juror could have concluded beyond a reasonable doubt that one or more of these three unknown individuals could have conspired with McMillian to distribute cocaine. We hold that the trial court did not err when it denied McMillian's motion for a new trial or, alternately, for a judgment of acquittal.

### III.

Appellant contends that the jury should not have convicted him of maintaining a common nuisance in violation of

section 286(a)(5) of article 27 of the Annotated Code of Maryland because the evidence showed only that the drugs were sold on one day, *i.e.,* there was no evidence to establish the recurring nature of the common nuisance offense.

In *Skinner v. State,* 16 Md.App. 116, 129, 293 A.2d 828, *cert. denied,* 267 Md. 744 (1972), we determined that the legislature intended the phrase " 'common nuisance,' " as used in section 286(a)(5), to retain its common law meaning. Thus, "[t]he recurring nature of the offense ... [is] an element of the crime under ... [that section]." *Id.* We further held that because the evidence in that case was that of a single day's violation, the evidence was "legally insufficient to permit the case to go to the jury." *Id.*

We clarified *Skinner's* proposition in *Hunt v. State,* 20 Md.App. 164, 166–67, 314 A.2d 743, *cert. denied,* 271 Md. 738 (1974). In *Hunt,* we affirmed the defendant's conviction of maintaining his apartment as a common nuisance, based upon evidence that the police seized on a single day when they executed a search warrant. *Id.* at 165, 314 A.2d 743. We explained that "[w]e did not lay down a rule [in *Skinner* ] that because evidence is found only on a single occasion it cannot be sufficient to show a crime of a continuing nature." *Id.* at 166–67, 314 A.2d 743. We further explained that we decided *Skinner* as we did because

> [t]here was no evidence from which a continuing or recurring nature of the possession could be inferred. There were simply no circumstances in *Skinner* to prove more than mere possession at the time of the search. But [we also said] this does not mean that other circumstances, short of proof of a similar offense on a different day, may not well be sufficient in a given case to prove continuing acts constituting a common nuisance.

*Id.* at 168, 314 A.2d 743.

In *Ward v. State,* 9 Md.App. 583, 593, 267 A.2d 255 (1970), we said that there is no particular time period in

which an event must occur for it to be considered "recurrent." Rather, we said that we must look to the facts and circumstances of each case to make that determination. We did say, however, that if the practice—giving due regard to its nature and the circumstances in which it occurred—were repeated often enough to warrant an inference that the [premises] were kept for the purpose of such practice, then that inference was sufficient evidence of its recurring nature. *Id.*

■ In this case, the evidence consisted almost solely of what the police observed during the four hour period between 3 p.m. and 7 p.m. on December 29, 1988. The police saw numerous drug transactions, involving many different buyers and at least two or more dealers, conducted from the Club. The drugs that the police seized totaled fifty-nine glassine bags of cocaine, which weighed more than seventy-two grams. Further, the nature of a social club suggests that people would come and go on a continuous basis in a single day and also on different days. Finally, when Officer Rood asked McMillian why he participated in these drug-related activities, McMillian replied "because [I] have to make a living."

We already have noted the appropriate standard of appellate review in section II, *supra.* We think that the jury reasonably could have found from the evidence before it that McMillian was maintaining a common nuisance. The nature of the Club in conjunction with the amount of cocaine that the police confiscated strongly suggests that people made purchases on a continuing basis—either on the same day or on different days. In addition, McMillian's remark that he had to make a living carries an inference that the activities which the police observed at the Club on December 28, 1988, were of more than a single day's duration. We hold that the trial court did not err when it refused to grant McMillian's motion for judgment of acquittal and motion for new trial or, in the alternative, for judgment of acquittal of maintaining a common nuisance.

**394**

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.