740 A.2d 81

Tony DIAZ

v.

STATE of Maryland.

No. 199, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Nov. 2, 1999.

54

Fred Warren Bennett (Jason D. Tulley and Bennett & Nathans, LLP, on the brief), Greenbelt, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and HOLLANDER and THIEME, JJ.

THIEME, Judge.

Tony Diaz, appellant, was convicted by a Baltimore City jury of possession of heroin with intent to distribute (Count 1), possession of cocaine with intent to distribute (Count 3), use or transport of a handgun (.357) in a drug trafficking (heroin) offense (Count 5), use or transport of a handgun (9mm) in a drug trafficking (cocaine) offense (Count 8), maintaining a common nuisance (heroin) in a vehicle (Count 9), maintaining a common nuisance (cocaine) in a vehicle (Count 10), and alter-

ing the serial number of a handgun (9mm) (Count 1 of a second indictment jointly tried).

Appellant was sentenced to twenty years for Count 1, increased to forty years pursuant to Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 293; twenty years for Count 3, increased to forty years under § 293; consecutive twenty years for Count 5 (merged with Count 8); consecutive twenty years for Count 9 (merged with Count 10), increased to forty years under § 293, consecutive; and three years for the alteration of the serial number, consecutive, the first five years to be served without parole pursuant to Count 5, for a total of 143 years.

Subsequently, the Circuit Court for Baltimore City granted appellant this belated appeal.[1] He presents the following questions:

1. Did the trial court err in replacing a seated juror on the second day of trial with an alternate when the original juror was seven and one-half minutes late; the court made no inquiry into the juror's whereabouts; and the record indicated poor weather and congested traffic that morning?

2. Did the trial court err in instructing the jury that possession alone of a handgun with an altered serial number shifted the burden of proof to the appellant by creating a presumption that the appellant had performed the alteration?

3. Did the trial court err in denying the appellant's motion for judgement of acquittal on the common nuisance charge where the evidence established drugs in the car in question on only one day and the offense requires proof of a repeated violation?

4. Did the trial court err in admitting irrelevant "expert" testimony regarding drug organizations, drug packag-

---

1. Appellant's original appeal was dismissed due to trial counsel's failure to perfect the appeal.

ing, and firing characteristics of different weapons; and testimony merely used to scare and inflame the jury?

5. Did the trial court err in applying the sentencing enhancement of Md.Code, Art. 27, § 293 to double three separate counts from sixty (60) years to one-hundred twenty (120) years, for a sentence totaling one-hundred forty-three (143) years, merely because of one prior possession of cocaine conviction?

6. Did the trial court err in refusing to instruct the jury that the presumption of innocence alone is sufficient to acquit the appellant?

We answer "no" to questions 1, 3, 4, and 6, "yes" to questions 2 and 5, and explain.

### Facts

On December 22,1992, Agent Thames of the Federal Bureau of Investigation ("FBI"), while staking out an apartment, saw someone he suspected to be appellant proceed to a car. This individual walked back and forth from the passenger side to the trunk a number of times before entering the car and driving away. Agent Thames followed the car and subsequently lost it. When Agent Thames again spotted the car later the same day, he and a number of other agents began to follow the car. The car sped up, and all the law enforcement personnel except for Agent Thames lost track of it. Agent Thames followed the vehicle until it parked in downtown Baltimore. There, the driver exited and went into a nearby building. Agent Thames identified the individual as the same man he had seen enter the car earlier in the day.

The police brought in drug-sniffing dogs that alerted to the car, which was then seized and subsequently searched. The police found two secret compartments in the door panels that were hydraulically locked, and could be opened by a mechanism under the steering wheel. Inside the compartments were 533 blue and white glassine bags of heroin, 355 yellow-topped vials containing cocaine, 10 yellow glassine bags containing heroin, 3 blue-topped vials containing cocaine, 9mm

and .357 handguns (both of which were loaded), $10,825 in cash, a social security card, and a certificate of citizenship and passport for Henry Rafael Diaz. The two larger bags containing the heroin and cocaine were dusted for fingerprints. The prints lifted did not match those of appellant. Neither the car itself nor the glassine bags and guns were tested for fingerprints. The serial number of the 9mm gun had been obliterated. The glove compartment contained several invoices for repair work done on the car that listed various names and addresses.

The car itself was registered to Carnell Burrow, who was initially arrested for the drugs recovered. The charges against him were subsequently dropped, however, in return for his testimony against appellant. Barrow denied being in the drug trade, and claimed that in December of 1991 appellant had paid him $900.00 to borrow his birth certificate so that appellant could obtain a car in his own name. The State also produced the testimony of Sofia Didley, who testified that appellant had shared an apartment with her in the fall and winter of 1992. This was the same apartment Agent Thames had staked out earlier on the day of the chase and seizure of the car.

In closing argument, the State argued to the jurors that they had a duty as citizens of Baltimore to stop the flow of drugs into their community from New York by finding appellant guilty on all counts. Attorneys for appellant argued that Burrow was in fact the person Agent Thames had seen driving the car in question and that the car registration had Burrow's signature on it.

Additional facts will be provided as required.

### Discussion

Appellant presents six assignments of error. We find four of those assignments of error to be disintegrous, but we find appellant's two assignments of error relating to the removal of a serial number from a semiautomatic firearm (Count 1 of the

second indictment), and to the sentence enhancements under § 293 to be meritorious.

## I.

### Dismissal of the Juror

██ On the beginning of the second day of trial, the trial court noticed that juror number 8 was missing. A discussion then ensued among counsel and the court, after which the court observed that seven minutes had passed since the time the trial was supposed to have commenced that morning, and that, according to the Sheriff, "there [was] nobody in sight, not in the jury room." When the trial court excused the jurors the preceding day, he had informed the jury to be in the courtroom by 9:30 a.m. The trial court replaced the absent juror with an alternate, and resumed the case at 9:37 a.m. Appellant's counsel objected, stating that the weather was stormy and raining and there had been an excessive amount of traffic during his drive to the courthouse.

 Replacement of a juror with an alternate juror for reasons of judicial efficiency is discretionary in Maryland. For non-capital cases, Maryland Rule 4–312(b)(3) provides:

> In all other cases, the court may direct that one or more jurors be called and impaneled to sit as alternate jurors. Any juror who, before the time the jury retires to consider its verdict, becomes or is found to be unable or disqualified to perform a juror's duty, shall be replaced by an alternate juror in the order of selection. An alternate juror who does not replace a juror shall be discharged when the jury retires to consider its verdict.

The decision to excuse a seated juror and replace him or her with an alternate for reasons particular to that specific juror will not be reversed unless there is "a clear abuse of discretion or prejudice" to the defendant. *State v. Cook*, 338 Md. 598, 620, 659 A.2d 1313, 1324 (1995). This standard of review exists for two reasons. First, " 'the trial judge is physically on the scene, able to observe matters not usually reflected in a

cold record.... [T]he judge has his finger on the pulse of the trial.'" *Id.* at 615, 659 A.2d at 1322 (quoting *State v. Hawkins,* 326 Md. 270, 278, 604 A.2d 489, 493 (1992)). Second, a defendant is not entitled to a jury comprised of any particular group of individuals, but only to a jury that is fair and impartial. *Id.* at 614, 659 A.2d at 1321–22.

Appellant argues that the court abused its discretion because a juror's tardiness by seven and one-half minutes does not mean that the juror was "unable or disqualified" from further service under Rule 4–312(b)(3) and that it was incumbent on the trial court to inquire as to whether the juror actually was unable or disqualified to continue her jury service before taking the "rash step" of dismissing her. His argument is unpersuasive. The trial court committed no error.

Appellant fails to show how the court committed the alleged abuse. When urging this Court to reverse for the trial court's failure to make a "minimal inquiry" into the juror's absence, appellant relies on a number of factually and legally inapposite cases. *See, e.g., Wilson v. Morris,* 317 Md. 284, 563 A.2d 392 (1989) (inquiry required when juror made biased remarks after trial began); *Green v. Zant,* 715 F.2d 551 (11th Cir.1983) (inquiry required when juror in death penalty case fell ill); *State v. Reevey,* 159 N.J.Super. 130, 387 A.2d 381 (App.Div. 1978) (inquiry required when juror appeared to be asleep during summations and charge); *State v. Hurd,* 325 S.C. 384, 480 S.E.2d 94 (S.C.App.1996) (inquiry required when juror appeared to be asleep during summations and charge). Appellant neglects to suggest from whom this preventive inquiry should have been made and how such inquiry would have changed the course of the trial. Neither does he suggest the degree to which a juror might be tardy that would render such inquiry unnecessary. we hesitate to make our way down this slippery slope, and we leave such matters in the hands of Maryland's trial judges. Incidentally, the record is silent as to when, or even if, the absent juror ever appeared.

The abuse of discretion standard presents appellant with a hurdle that he fails to clear. In addressing judicial discretion

in *Gunning v. State,* 347 Md. 332, 701 A.2d 374 (1997), the Court of Appeals stated:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.
>
> A proper exercise of discretion involves consideration of the particular circumstances of each case. As Chief Judge Bond observed in *Lee v. State,* 161 Md. 430, 441 [157 A. 723] (1931), "the discretion being for the solution of the problem arising from the circumstances of each case as it is presented, it has been held that the court could not dispose of all cases alike by a previous general rule." Hence, a court errs when it attempts to resolve discretionary matters by the application of a uniform rule, without regard to the particulars of the individual case.

*Id.* at 351–53, 701 A.2d at 383–84 (in part quoting *In re Don Mc,* 344 Md. 194, 201, 686 A.2d 269, 272 (1996)) (citations omitted).

Here, the facts show that the trial judge was concerned that the juror's tardiness would delay the entire proceeding. Although appellant points out that the State's intended first witness was late as well, the State simply shifted the order of its testimony to allow the tardy witness to testify later in the day.

■ We interpret the rules to "secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay." Md. Rule 1–201. Here, the trial judge's interpretation of Rule 4–312(b)(3) was reasonable under the circumstances. Although it may have been preferable in retrospect for the trial judge to inquire into the juror's whereabouts, even a premature dismissal of a juror would not

be cause for reversal. *See, e.g., Myers v. State,* 58 Md.App. 211, 234–35, 472 A.2d 1027, 1039, *cert. denied,* 300 Md. 484, 479 A.2d 373 (1984) (if no prejudice, removal of a juror based on factual error by court is not cause for reversal) (*cited in Cook,* 338 Md. at 610, 659 A.2d at 1320); *Bluthenthal & Bickart v. May Advertising Co.,* 127 Md. 277, 285–86, 96 A. 434, 437–38 (1915) ("it is not reversible error for the Court on its own motion to exclude a juror, even for insufficient cause, if an unobjectionable jury is afterwards obtained") (*quoted in Cook,* 338 Md. at 610, 659 A.2d at 1319).

Appellant does not attempt to argue that he was prejudiced by the substitution. He correctly points out that the "abuse of discretion *or* prejudice" standard is disjunctive, and would allow reversal on the basis of *either* abuse of discretion or prejudicial error. *See, e.g., Cook,* 338 Md. at 609–10, 659 A.2d at 1319 ("there is no reason to reverse a trial judge who excludes an individual juror unless the removal of the juror constitutes a clear abuse of discretion on the part of the trial judge or the defendant can demonstrate that he or she suffered some prejudice"). The recent decision of the Court of Appeals in *Hayes v. State,* 355 Md. 615, 635, 735 A.2d 1109, 1120 (1999), makes clear that proving actual prejudice is not necessary in situations where prejudice could easily occur. *Hayes* rejects the "expansive harmless error or presumptive non-prejudice doctrine [of federal jurisprudence] that is entirely foreign to our jurisprudence."

This case, however, is readily distinguishable. *Hayes* narrowly focused on the timing of the juror's substitution relative to the beginning of jury deliberations, holding that "an alternate juror who remains qualified to serve may be substituted for a regular juror who is properly discharged, until such time as the jury enters the jury room . . . and closes the door." *Id.* The Court was concerned that prejudice might arise from substitution during the brief period after the jury retires but before it begins formal deliberations. *Hayes* creates a bright-line rule to prevent the possibility of prejudice. Here, in contrast, the substitution of the juror occurred during the trial itself, before any jury deliberations began. *See id.*

In the absence of the implied prejudice found by the Court in *Hayes,* appellant would need to show how prejudice did or might have occurred. He has failed to do so. In fact, prejudice would have been unlikely. The alternate juror had been seated with other jurors during the first day of the trial; she had the opportunity to hear all evidence presented and abide by the court's instructions for maintaining a fair and impartial body of jurors.

## II.

### Obliterated Serial Number

On the second issue, jury instructions regarding the obliterated serial number under Count 1 of the separate indictment, appellant argues that the instruction given by the trial court unconstitutionally shifts the burden of proof from the State to appellant and that the instruction as given effectively makes the presumption irrebuttable. He is correct. Appellant successfully preserved the issue for appeal, despite the State's chasing chimera to discourage the court from further examining the issue.

The trial court instructed the jury as follows on the altered serial number found on the 9mm firearm:

And finally, altering the serial of a handgun. The defendant has been charged with altering the serial number of a handgun. The State must prove that the defendant had possession of a firearm. So first you must find that he did have possession of the firearm. Where the manufacturer's identification mark or number was obliterated, removed, changed, or altered. Possession of such a firearm is presumptive evidence that the defendant obliterated, removed, changed or altered the identification mark or number. Do you understand presumptive evidence?

That if you find that the defendant had possession of that firearm then it is presumptive, it is presumed true that the defendant obliterated, removed, changed or altered the identification mark or number.

■ Exceptions were taken immediately after the court instructed the jury. Appellant noted his objection to this instruction of the court as follows: "The court instructed the jury that if one is in real possession of a firearm on which the serial number has been obliterated that is presumptive evidence that he did it. I do not believe that is the status of—." When asked to continue, counsel declared, "That's all I have to say on that."

The State asserts that appellant has waived this issue by failing to make known to the court the action that appellant desired it to take. *See* Md. Rule 4–323(c) ("[f]or purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court"); Md. Rule 8–131(a) ("[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised or decided by the trial court. . . .").

As a preliminary matter, appellant pellucidly preserved this issue for appeal. The entire record of jury instruction discussions disclosed that, in advance of the jury instruction itself, and after reviewing with counsel the trial court's proposed written instructions, the court solicited objections from the parties. At that time, appellant re-submitted his proposed jury instructions and asked for an exception to be taken for all of the trial court's instructions that differed from his own:

> [APPELLANT'S COUNSEL]: What I intend to do, Your Honor, with the permission of the Court, is I want to hand the Clerk my original prayers that I submitted in chambers last evening. I know the Court didn't have time to carefully review them all. The Court does have it's [*sic*] own instructions for various crimes that are alleged. I would just, at this time Your Honor, move to introduce my requested prayers and generally take exception.[2]

---

2. The method of making objections is set forth in Maryland Rule 4–323. As to the use of the term "exception," counsel are reminded of *Mayor*

THE COURT: All right. The Clerk will mark them as Defendant's Exceptions to the Court's Instructions, Defendant's Exceptions to the Court's Instructions.

Appellant's requested jury instruction, given to the court at that time, read as follows:

The Defendant is charged with the crime of obliterating, removing, changing, and altering the manufacturer's identification mark or number on a certain firearm, to wit: a Ruger 9mm Semi–Automatic handgun.

In order to convict the Defendant, the State must prove beyond a reasonable doubt that the Defendant possessed said firearm and that the Defendant obliterated, removed, changed or altered the manufacturer's identification mark or number.

You are instructed that the previous definition which I have given you regarding the law of possession and the law of what is a firearm is to be used when deciding whether the Defendant obliterated, removed, changed or altered the manufacturer's identification mark or number.

Later, when jury instructions had been given, appellant's trial counsel stated in addition to the remarks quoted above: "First of all, let me incorporate all of the previous objections. Your Honor with regard to your instruction regarding the alteration of the serial number on the firearm, *I would object to the instruction.*"

---

*and City Council of Baltimore v. Theiss,* 354 Md. 234, 242 n. 6, 729 A.2d 965 (1999):

"Apparently, a general exception was made at trial without specificity. The term 'exception,' as used in the 1908 [*Baltimore & Ohio Railroad Co. v. State ex rel. Black,* 107 Md. 642, 653, 69 A. 439, 443] case, was the formal method then used for attempting to preserve an adverse ruling for purposes of appeal. After an adverse ruling the aggrieved party asked the court clerk to note an exception to the ruling on the record. At the conclusion of the trial, all of the exceptions taken would constitute a Bill of Exceptions, which would form the basis for appeal.... The Court in *Black* was speaking in the context of a mere general objection and resulting general exception, holding that *unless made with sufficient specificity,* the exceptions did not, even then, preserve the issue for appeal." footnote 9. (Citations omitted; emphasis in original.)

When all of appellant's efforts are considered *in toto*, it becomes obvious that he preserved the issue. *See Franklin v. Gupta*, 81 Md.App. 345, 365, 567 A.2d 524, 534 (1990) (submitting proposed jury instruction and taking exception to trial court's failure to provide such an instruction properly preserves issue for appellate review). Appellant made it clear that he was challenging the irrebuttable presumption of proof created by the trial court's instruction.

The trial court closely followed the language of Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 444, which provides:

It shall be unlawful for anyone to obliterate, remove, change or alter the manufacturer's identification mark or number on any firearms. Whenever on trial for a violation of this section the defendant is shown to have or have had possession of any such firearms, such fact shall be presumptive evidence that the defendant obliterated, removed, changed or altered the manufacturer's identification mark or number.

Yet giving a jury the bare statutory language, without explaining to them that the presumption may be overcome, in this context effectively turns a rebuttable presumption into an irrebuttable one. It is enough that the "specific instruction, both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State provides certain predicate facts." *Carella v. California*, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989) (per curiam). In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), for example, the Supreme Court found that a bare statement that the law presumes that "a person intends the ordinary consequences of his voluntary acts" could be taken as a mandatory instruction. As in *Sandstrom*, the court below stated without elaboration the same type of basic presumption, that "[p]ossession of . . . a firearm [where the manufacturer's identification mark or number was obliterated, removed, changed, or altered] is presumptive evidence that the defen-

dant obliterated, removed, changed or altered the identification mark or number."

Such an instruction "invade[s] the truth-finding task assigned solely to juries in criminal cases," and effectively forecloses jury consideration of whether the facts presented by the State prove all required elements of the offense. *Carella,* 491 U.S. at 265, 109 S.Ct. at 2420. As a result, the instruction, as given, unconstitutionally alters the State's burden of proof for some elements, imposing upon the defendant a burden of disproof that conflicts with the overriding presumption of innocence. *See Sandstrom,* 442 U.S. at 521–24, 99 S.Ct. at 2458–59 (citing *Morissette v. United States,* 342 U.S. 246, 274–75, 72 S.Ct. 240, 255–56, 96 L.Ed. 288 (1952)). "The Due Process Clause of the Fourteenth Amendment denies the State the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." *Carella,* 491 U.S. at 265, 109 S.Ct. at 2420 (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)).

We are, of course, obligated to follow *Carella, Sandstrom,* and *Winship,* and additionally our own precedents wherein appellants have made similar challenges to the constitutionality of common law presumptions and inferences. We held, for example, in *Horn v. Maryland,* 29 Md.App. 23, 349 A.2d 372 (1975), that "the rule regarding possession of recently stolen goods does not create a 'presumption' but merely permits an inference of fact." *Id.* at 25, 349 A.2d at 373. "An illogical or improbable 'inference' would ... unfairly relieve the State of part of its burden of proving every element of a case beyond a reasonable doubt." *Id. Accord Dinkins v. State,* 29 Md.App. 577, 580, 349 A.2d 676, 679, *adopted by,* 278 Md. 238, 362 A.2d 91 (1976) ("The historical basis of the inference, however, does not guarantee its constitutionality. Common law inferences must satisfy due process standards in light of present day experience."); *Boswell v. State,* 5 Md.App. 571, 578, 249 A.2d 490, 496 (1968) ("The inference to be drawn from possession of recently stolen goods is one of fact and it does not in any case raise a presumption of law of the possessor's guilt.").

Likewise, in *Evans v. State*, 28 Md.App. 640, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976), to the presumption that murder is in the second degree, we applied the teachings of *Winship* and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), which hold that the State has the full burden of proof in homicide cases and the defendant is under no burden to produce mitigating evidence. We admonished lower courts at that time to refrain from instructing juries with careless phraseology such as, "All murder will be presumed to be murder in the second degree." Although such statements, standing alone, are not constitutionally infirm, they potentially confuse jurors about which party carries the burden of proof. *Evans*, 28 Md.App. at 680, 349 A.2d at 326. *Accord State v. Garland*, 278 Md. 212, 219, 362 A.2d 638, 642 (1976) ("[W]hen the issue of mitigation is properly presented by the evidence, it is the State's burden to prove its absence beyond a reasonable doubt."); *Banks v.* State, 92 Md.App. 422, 439–40, 608 A.2d 1249, 1258 (1992) ("Absence of mitigation is presumed, unless the defendant produces some evidence to make mitigation an issue in the case . . ., [then] the State has the burden of proving the absence of mitigating circumstances.").

■ Thus, under harmless error analysis and after examining the entire record, *Rose v. Clark*, 478 U.S. 570, 579–80, 106 S.Ct. 3101, 3106–07, 92 L.Ed.2d 460 (1986) (applying harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to erroneous jury instructions), we cannot say beyond a reasonable doubt that the faulty instruction played no part in the jury's decision to convict appellant. The instruction given did not make clear that the statutory presumption was rebuttable, nor did it reiterate the State's paramount duty to prove beyond a reasonable doubt every element of the crime. Although the trial judge asked the jurors if they understood presumptive evidence, this rhetorical inquiry fell short of the standard articulated in cases like *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (instruction was reversible error, even though judge told jury presumption "may be rebutted" and read during the

charge general instructions on the State's burden of proof and duty). We thus reverse appellant's conviction on this count.

## III.

### Common Nuisance

On the third issue, whether the evidence of common nuisance was legally sufficient, appellant's conviction stands. The trial court did not err. At the close of the State's case, appellant challenged the legal sufficiency of the evidence to sustain his conviction for maintaining a common nuisance. He claimed that the evidence presented by the State demonstrated only that drugs were in the car on the day it was searched. Thus, according to appellant, the State failed to prove the repeated nature of this violation. The trial court found that the sophistication of the hidden panel system implied a continuing violation and overruled appellant's motion for judgment of acquittal.

Appellant now contends that drugs were found in the car on one occasion only, and that the State failed to prove "previous use" of the hidden compartments or, at the very minimum, to show when the hidden compartments were installed. Appellant argues, as in *Nickens v. State,* 17 Md.App. 284, 301 A.2d 49 (1973), that the mere implication of prior use from the drugs themselves cannot substitute for actual evidence of a repeated violation necessary for a common nuisance conviction.

The standard for appellate review of evidentiary sufficiency is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *Accord Wiggins v. State,* 324 Md. 551, 566–67, 597 A.2d 1359, 1366 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were

supported with sufficient evidence—that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336, 337 (1994). In contrast, it is the *exclusive* function of the jury to draw reasonable inferences from proven facts. *McMillian v. State,* 325 Md. 272, 290, 600 A.2d 430, 439 (1992). Moreover, measuring the weight of the evidence and judging the credibility of witnesses are always matters entrusted to the jury as the trier of fact. *Id. See also Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111, 114 (1993).

 With this standard of review as our polaris, we now evaluate the sufficiency of the evidence required to convict one of maintaining a common nuisance under Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 286(a)(5). Under this statute, it is unlawful for any person

> [t]o keep or maintain any common nuisance which means any dwelling house, apartment, building, vehicle, vessel, aircraft, or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia. . . .

Section 286(a)(5). The essential element of the offense under this statute is its recurring nature. *Davis v. State,* 100 Md.App. 369, 387, 641 A.2d 941, 950 (1994) (citing *Skinner v. State,* 16 Md.App. 116, 129, 293 A.2d 828, 836, *cert. denied,* 267 Md. 744 (1972)). Evidence found on a single occasion, however, may be sufficient to demonstrate a crime of a continuing nature.

> [T]here is no particular extent of time prescribed during which the improper practices must continue or recur; *each case must be adjudged according to its own circumstances.* It is usually deemed sufficient if, when the character of the culpable acts and the circumstances under which they were

committed are taken into account, it appears that they were repeated often enough to warrant an inference that the house was kept for the indulgence of such practices.

*Ward v. State,* 9 Md.App. 583, 593, 267 A.2d 255, 261 (1970) (emphasis added). This analytical framework complements this court's general standard for assessing sufficiency of evidence, "'whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged.'" *McMillian v. State,* 325 Md. at 295, 600 A.2d at 441 (quoting *Wilson v. State,* 319 Md. 530, 535–36, 573 A.2d 831, 834, *rev'd on other grounds,* 319 Md. 530, 573 A.2d 831 (1990)).

*Hunt v. State,* 20 Md.App. 164, 314 A.2d 743 (1974), *cert. denied,* 271 Md. 738 (1973), teaches that we evaluate whether the evidence supports a rational inference from the facts such that the trier of fact could be convinced of guilt beyond a reasonable doubt. Andre Hunt was convicted of maintaining his apartment as a common nuisance based on evidence seized on a single day in the execution of a search warrant. Found in the apartment were large quantities of drugs packaged for street sale, paraphernalia, and ledgers of sale. *Id.* at 165, 314 A.2d at 743–44. A detective testifying as an expert witness classified the items seized as part of a large operation. *Id.* at 166, 314 A.2d at 744. This Court concluded that, based on the evidence found and expert testimony regarding the inferences to be drawn therefrom, the "evidence was sufficient to show continuing and recurring acts" at that apartment which constituted the crime of maintaining a common nuisance. *Id.* at 169, 314 A.2d at 745.

Here, in the course of ruling on appellant's motion for judgment of acquittal on all of the counts, the trial judge made the following observations:

> We have the sophistication of the concealment. We have the quantity of the concealment, indicating a vast operation, not only money, the large amount of drugs, expensive weapons—high caliber expensive weapons—very, very so-

phisticated armament and, in addition to that, all of this combined in one, in two concealed locations, I heard the word hydraulic—certainly electrical method of opening and shutting them.

The trial court observed that "by the sophistication of the method of concealment that a Juror could reasonably believe that this was not put together for this particular day, but for a continuing operation of concealment of drugs."

Under *Hunt,* the trial court was correct. A search of the interior of appellant's car revealed hidden compartments in each side wall of the back seat area where the arm rest ordinarily would be. Whereas the interior side walls of most cars are molded plastic, perhaps with cloth covering, the side walls of appellant's car had cloth-covered steel panels, which covered a secret compartment on each side of the vehicle. The police had to forcibly pry open those compartments, but later discovered under the steering column a complex electrical control system for opening the hydraulic locks on the compartments. Inside these artfully concealed compartments were 543 glassine bags containing a white powdery substance, which was later tested and determined to be heroin. As in *Hunt,* the State called an expert witness, who testified that heroin typically is packaged for street sale in gelatin capsules or glassine envelopes. There was also expert testimony that the drugs were packaged in a "professional manner," indicating that they "came from outside of Baltimore City proper." Police also found in the car 80 vials of cocaine, over $10,000.00 in cash, a box of large Ziplock bags, and two loaded guns in holsters, one of which was a 9mm weapon with its serial number obliterated with a drill, indicating a "professional job." Under *Hunt,* the foregoing evidence is legally sufficient to establish that appellant maintained this vehicle on a recurring basis as a common nuisance for the purpose of distributing narcotics, rather than on the one day the police perchance performed their search. The enormous quantity of drugs and currency concealed within sophisticated hidden compartments operated by a complex electro-hydraulic system indicated that the use of this deliberately restructured car was not a single,

isolated violation of the narcotics laws but, rather, an ongoing criminal enterprise.

The cases cited by appellant are inapposite to the facts at hand. First, his reliance on *Nickens* is misplaced. In *Nickens*, police executed a search warrant for an apartment and a car. The car search recovered 43 glassine bags of heroin. The apartment search recovered numerous articles of paraphernalia and contraband drugs. Although a juror could have inferred an ongoing violation of the narcotics laws from the quantity of drugs and paraphernalia recovered, this Court found that the evidence was insufficient to go to the jury on a common nuisance charge because "[t]he proof of narcotic violations occurring only at the time in question was insufficient to establish the element of the recurring nature of the offense...." *Nickens,* 17 Md.App. at 292, 301 A.2d at 53.

Similarly, in *Skinner,* 16 Md.App. at 124, 293 A.2d at 833, the only evidence supporting the common nuisance charge was that drugs were found in the defendant's automobile on the single day it was searched. Because the recurring nature of the offense was not shown, proof "of a single day's violation was legally insufficient to permit the case to go to the jury." *Id.* at 129, 293 A.2d at 836. *Nickens* relied on the decision in *Skinner* in holding that drugs and paraphernalia found in the defendant's car on the day it was searched did not establish their presence on any day other than the day when they were seized. *Nickens,* 17 Md.App. at 291, 301 A.2d at 53. Although we did not repudiate *Skinner,* which includes a classic exposition of the roots of Maryland's common nuisance statute, we made it clear in *Hunt,* "lest our decisions in *Skinner v. State* and *Nutt v. State* [16 Md.App. 695, 299 A.2d 468 (1973)] be misconstrued," that the fruits of a single search could be sufficient evidence of ongoing criminal activity. *Hunt,* 20 Md.App. at 165, 314 A.2d at 743 (citations omitted).[3] As in

---

**3.** Appellant also relies on *Berlin v. State,* 12 Md.App. 48, 277 A.2d 468, *cert. denied,* 263 Md. 710 (1971), which is another pre-*Hunt* opinion. *Berlin* is equally distinguishable. At issue was a single sale of narcotics on a single day and, as such, "there was no evidence from which the

*Hunt,* the presence of unused drug packaging materials, as well as the sophisticated concealment devices, weaponry, and sheer quantity of drugs found, would clearly support a finding that appellant was involved in an ongoing drug distribution enterprise. Appellant's conviction for maintaining a common nuisance stands.

## IV.

### Expert Witness

In his fourth assignment of error, appellant challenges the admissibility of the expert testimony of Agent Robert Sheehy, who worked for the FBI for approximately fifteen years. Appellant argues that the trial court erred in admitting Agent Sheehy's irrelevant and inflammatory testimony.

As a federal officer, Agent Sheehy has spent roughly ten years investigating narcotics cases, focusing on the interrelationship between drug groups and violence. He has received extensive training in the field. As a result of working on about one hundred drug cases, he developed expertise in the areas of drug packaging and drug identification. The trial court, without objection by the defense, accepted Agent Sheehy as an expert in the field of drug investigation, "which includes identification and packaging and distribution."

Over defense objection, Agent Sheehy testified that, based on the method of packaging the heroin found in appellant's car, and the brand name labeling of the packages, it was his opinion that the packaging had been done by a professional organization outside of Baltimore. He explained that the particular brand names, such as "Infinity" and "Fire" stamped on the packages, had never been seen in Baltimore.

Agent Sheehy also stated that he had training in the evaluation of weapons used by drug dealers in drug organiza-

---

jury could find a continuing character of the culpable acts." *Id.* at 58, 277 A.2d at 473.

tions. When asked over objection "what if anything is there about drug dealers and drug organizations in general having semiautomatic weapons," Agent Sheehy replied that there had been a rise in recent years in the use of semiautomatic weapons by drug organizations because the greater firing potential of the weapons made them more deadly. He further testified over objection that drug organizations are violent and often use guns to protect their drugs.

Appellant argues that Agent Sheehy's testimony was irrelevant and highly prejudicial in a manner calculated to scare the jury into believing, as the prosecutor indicated in closing argument, that appellant was a "monestrous" [*sic* ] and "dangerous and guilty" drug organizer from New York who should be convicted to "protect our community" in Baltimore. According to appellant, Agent Sheehy's testimony suggested that appellant was a member of a large drug organization and used the most dangerous types of weapons to protect his drugs.

We find, however, that Agent Sheehy's testimony was relevant and not an abuse of discretion. Examination of witnesses at trial is left to the discretion of the trial judge. No error will be recognized in the absence of an abuse of discretion. *Marshall v. State,* 85 Md.App. 320, 328, 583 A.2d 1109, 1113 (citing *Trimble v. State,* 300 Md. 387, 401, 478 A.2d 1143, 1150 (1984)), *cert. denied,* 323 Md. 2, 590 A.2d 159 (1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). " '[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258, 273 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) (quoting *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984)). *Accord Thanos v. State,* 330 Md. 77, 95, 622 A.2d 727, 735 (1993); *Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581, 590 (1992).

, [14–16] As with other forms of evidence, expert testimony must be both relevant and competent. Expert testimony is

relevant if " 'the jury will receive appreciable help from the ... testimony in resolving the issues presented in the case.' " *Oken,* 327 Md. at 659, 612 A.2d at 273 (quoting *Simmons v. State,* 313 Md. 33, 41, 542 A.2d 1258, 1262 (1988)). Such testimony is competent if the expert's conclusions are based upon a legally sufficient factual foundation. *Id.* at 660, 612 A.2d at 273. The determination of whether an expert witness has an adequate factual basis for his opinion is discretionary and will not be overturned absent a showing of abuse. *Hunt v. State,* 321 Md. 387, 423, 583 A.2d 218, 235 (1990) (correctional officer's opinion testimony based on experience that prisoner was "dangerous" was not abuse of discretion), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991).

Appellant argues that in *Cook v. State,* 84 Md.App. 122, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991), the trial court permitted a law enforcement officer to testify as an expert on drug organizations and their operation. The police had searched a house containing three people and found a large number of vials, some filled with cocaine and others empty. Assorted packaging materials and pipes were also found in the house, as well as a gun. The expert witness, who was also one of the arresting officers, testified that the home was obviously a distribution point for drugs and opined as to which codefendant played which role in the operation. *Id.* at 135–37, 578 A.2d at 289–91.

This court reversed the defendants' convictions after finding that the trial court had abused it discretion in admitting the expert opinion evidence, unsupported by facts, about which defendant played which role in the operation:

> [The expert witness] was, in effect, stating an opinion that both appellants were guilty of all charges: as members of an organization using the house in which they were found for the distribution of the cocaine that was found in the house, both would be (1) in joint possession, actual or constructive, of the cocaine; (2) part of one or more conspiracies to possess and to distribute the cocaine; and (3) using the house for the distribution of cocaine, i.e., maintaining a common nuisance.

*Id.* at 137, 578 A.2d at 290–91. The Court found that the expert witness's testimony was so prejudicial that it outweighed its usefulness to the jury in determining which of those persons arrested was part of a drug organization and which was merely an invited guest. *Id.* at 139–40, 578 A.2d at 291–92. The Court also observed that the officer's opinions were not necessary for the jury to understand the facts. "The witness could have described the pattern of conduct normally, usually, or frequently associated with cocaine distribution operations and left it to the jury to decide whether appellants' conduct fit that pattern." *Id.* at 142, 578 A.2d. at 293. In the absence of factual evidence to support the officer's conclusion that one of the defendants was on the scene as a distributor, the admission of the testimony was error. *Id.* at 143–44, 578 A.2d at 293–94. The Court thus held that the trial court had abused its discretion. *Id.* at 142, 578 A.2d at 293.

In contrast to the expert witness who testified in *Cook*, Agent Sheehy simply offered general information as to the methods of drug packaging used by professional drug organizations and the types of weapons commonly used by such organizations. Agent Sheehy spoke in general terms about professional drug organizations and their various defining characteristics. Unlike the expert witness in *Cook*, he did not testify that appellant was a member of any such organization. Instead, Agent Sheehy merely stated that the manner of packaging of the drugs found in appellant's car was consistent with a professional, out-of-town organization, and that the guns found were the type generally used by drug dealers. As for that sort of evidence, the *Cook* Court said, "[I]t would certainly have been permissible for the officer to describe how such operations are normally or typically conducted . . . . [or] to include testimony that the head of the organization is normally armed and usually has the organization's money on his person, . . . ." *Id.* at 139, 578 A.2d at 291–92. Such testimony, the type given by Agent Sheehy, allows the jury to draw its own conclusions as to guilt or innocence. Agent Sheehy's testimony laid more than sufficient foundation in the record for the opinions presented. It did not impermissibly

invade the province of the jury. Agent Sheehy provided the jury with useful information about drug distribution enterprises that is unknown to most jurors.

Appellant further argues that the trial court's error is more egregious than the one made by the *Cook* Court. In addition to the drug distribution testimony, appellant claims, irrelevant testimony on the deadly nature of semiautomatic weapons inflamed the jury, causing it to perceive him as a drug organizer from New York. Appellant states that such testimony regarding weapons only prejudiced the jury into believing appellant was violent and dangerous, characteristics that had nothing to do with the crimes with which he had been charged. The prejudicial effect of these errors was greater, he asserts, because the witness was an FBI agent, a credential that carries much weight with jurors. Appellant urges this Court to follow the precedent of *Cook* and remand his case for a new trial. *See also Banks v. State,* 84 Md.App. 582, 581 A.2d 439 (1990) (reversing defendant's drug conviction because of the prejudicial introduction into evidence of irrelevant picture of defendant with a gun); *Dobson v. State,* 24 Md.App. 644, 335 A.2d 124 (1975) (reversing because the prejudice of irrelevant gun testimony could not be considered harmless).

Appellant relies on *Banks* and *Dobson,* both of which are distinguishable. In *Banks,* the defendant, who was convicted of cocaine distribution, challenged the prejudicial effect of the State's use of photographs showing him holding a handgun to assist a witness in making identification. The State, which had seized the pictures during a search of the defendant's home, *Banks,* 84 Md.App. at 585, 581 A.2d at 441, conceded that the pictures were only minimally relevant. *Id.* at 590, 581 A.2d at 443. The Court found that the photographs were irrelevant and highly prejudicial, and thus the error in admitting them was not harmless beyond a reasonable doubt. *Id.* at 591–92, 581 A.2d at 444. Here, two actual handguns secreted in concealed compartments along with drugs were recovered in the search of appellant's car. It was no abuse of discretion for the trial court to permit an expert witness to speak on the relationship between firearms and drug trafficking.

For similar reasons, *Dobson* is inapposite. In *Dobson,* the court admitted testimony from a witness who said he had seen the defendant with a weapon four months before the events giving rise to his conviction for a panoply of violent crimes. The State intended this testimony to impeach testimony from the defendant's father stating that he had never seen his son in possession of a gun. This Court held that the rebuttal testimony neither explained nor contradicted that of the defendant's father. *Dobson,* 24 Md.App. at 659–60, 335 A.2d at 133. Therefore, it was irrelevant, and "obfuscated the real issues by injecting into the trial 'evidence of . . . [the] defendant's evil character' in toting the gun in order 'to establish a probability of his guilt.'" *Id.* Once again, in the case at bar, actual firearms were discovered and admitted into evidence. The court did not abuse its discretion in admitting testimony that addressed the purpose such weapons normally serve in drug trafficking.

In summary, contrary to appellant's characterization, nothing said by Agent Sheehy would tend "to scare the jury into believing . . . that appellant was a big-time, scary drug dealer, head of a large evil organization from New York, and therefore he should be convicted to 'protect our community.'" Sheehy's testimony did not unfairly prejudice appellant. A strong presumption exists that judges properly perform their duties in balancing probative value against unfair prejudice. *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105, 110 (1993). *Accord State v. Woodland,* 337 Md. 519, 526, 654 A.2d 1314, 1317 (1995). That presumption was not overcome in this case. The court did not abuse its discretion by admitting such evidence.

## V.

### The Sentencing Enhancement

Appellant's fifth assignment of error, however, does indicate that the trial court erred in applying the sentencing enhancement provisions of Md.Code, Art. 27, § 293. We reverse the trial court's imposition of the enhanced sentences

under Counts 1, 3 and 9. In applying § 293 at sentencing, the trial court gave appellant the maximum possible penalty. The State had filed a notice of intent to seek enhanced penalties pursuant to § 293, which allows for the doubling of sentences for drug-related convictions when the defendant has been found guilty of a prior drug-related offense. The trial court doubled the sentences for each of appellant's three drug convictions, possession of heroin with intent to distribute, possession of cocaine with intent to distribute, and maintaining a common nuisance, from twenty to forty years. Appellant objects, arguing that the legislature did not intend such a harsh result. Appellant has one prior drug conviction for possession, and argues that the legislature did not intend that the sentence for each and every count of the latter conviction be doubled but, rather, that the sentence for only one of the counts be doubled. We agree.

Article 27, § 293 provides, in pertinent part, as follows:

(a) *More severe sentence.*—Any person convicted of any offense under this subheading is, if the offense is a second or subsequent offense, punishable by a term of imprisonment twice that otherwise authorized, by twice the fine otherwise authorized, or by both.

(b) *Second or subsequent offense defined.*—For purposes of this section, an offense shall be considered a second or subsequent offense, if, prior to the conviction of the offense, the offender has at any time been convicted of any offense or offenses under this subheading or under any prior law of this State or any law of the United States or of any other state relating to the other controlled dangerous substances as defined in this subheading.

To apply this section, the State must serve the defendant with notice fifteen days prior to the trial. Md. Rule 4–245; *Lee v. State,* 332 Md. 654, 632 A.2d 1183 (1993).

Appellant argues, with merit, that the statute's meaning is unclear. Our goal in analyzing a statute is a "commonsensical" approach, avoiding "giving the statute a strained interpretation or one that reaches an absurd result." *Richmond v.*

*State,* 326 Md. 257, 262, 604 A.2d 483, 486 (1992). When interpreting statutory language, courts assume that the words of the statute have their ordinary and natural meaning, absent some indication to the contrary. *Briggs v. State,* 348 Md. 470, 477, 704 A.2d 904, 908 (1998); *Atkinson v. State,* 331 Md. 199, 215, 627 A.2d 1019, 1027 (1993); *Richmond,* 326 Md. at 262, 604 A.2d at 486. Where the words of the statute are clear and unambiguous, there usually is no need to go further in construing the statute. *Briggs,* 348 Md. at 477, 704 A.2d at 908. *See also In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012, 1016 (1994) (applying same principle of statutory interpretation to Maryland Rules). That is, if the language is plain, clear and consistent with the statute's apparent purpose, no further analysis is ordinarily required. *Gargliano v. State,* 334 Md. 428, 435, 639 A.2d 675, 678 (1994). On the other hand, if the language is ambiguous or unclear, "we must consider 'not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment,' in our attempt to discern the construction that will best further the legislative objectives or goals." *Id.* at 436, 639 A.2d at 678 (quoting *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730, 732 (1986)).

Here, the statute is unambiguous given a straightforward application in a case involving a single count indictment, but, when the court is faced with a multi-count indictment, *i.e.,* when multiple infractions springing from a single course of conduct are tried together, the picture becomes obfuscated. "That a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled." *Tucker,* 308 Md. at 74, 517 A.2d at 732. *See also Town & Country Management Corp. v. Comcast Cablevision,* 70 Md.App. 272, 280, 520 A.2d 1129, 1132–33, *cert. denied,* 310 Md. 2, 526 A.2d 954 (1987) ("Language can be regarded as ambiguous in two different respects: 1) it may be intrinsically unclear . . . ; or 2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain."). Because the statute is not clear about whether the word "offense" applies to a single count within an

indictment or encompasses multiple counts, it is likewise not clear whether the trial judge can apply sentencing enhancement for each count when a defendant is convicted under a single indictment of more than one count to which § 293 may apply. Until the legislature can clarify this statutory shortcoming, however, we hold that the rule of lenity requires that enhancement apply to only one of the three drug offenses. To refuse to apply the rule would be fundamentally unfair and would enlarge an already long sentence to the point of absurdity.[4]

The rule of lenity requires that ambiguous penal statutes be strictly construed against the State and in favor of the defendant. Section 293 is one such highly penal statute. *Scott v. State,* 351 Md. 667, 675, 720 A.2d 291, 294–95 (1998). The rule of lenity exists as a guarantee that criminal defendants will be treated fairly. As the Court of Appeals stated in *Robinson v. Lee,* 317 Md. 371, 379–80, 564 A.2d 395, 399 (1989):

> Fundamental fairness dictates that the defendant understand clearly what debt he must pay to society for his transgressions. If there is doubt as to the penalty, then the law directs that his punishment must be construed to favor a milder penalty over a harsher one.

*Accord Gatewood v. State,* 244 Md. 609, 617, 224 A.2d 677, 682 (1966) ("A criminal statute must be strictly construed in favor of the defendant.").

Recent cases from the Court of Appeals support our reasoning. Applying the rule of lenity, the Court of Appeals held in *Scott* that a defendant's sentence could not be doubly-enhanced using both the provisions of § 293 and of Maryland Code, Art. 27, § 286(f), which provides for mandatory minimum sentences that may not be suspended and for limitations

---

4. For example, the State conceivably could have included three additional counts: conspiracy to possess heroin with intent to distribute, conspiracy of possession of cocaine with intent to distribute, and conspiracy to maintain a common nuisance, and upon conviction could have added an additional 120 years to the sentence.

of parole for certain drug offenses. *Scott,* 351 Md. at 667, 720 A.2d at 291. Likewise, the Court held in *Gardner v. State,* 344 Md. 642, 689 A.2d 610 (1997), that a sentence for a single count of possession with intent to distribute could not be enhanced twice by applying both §§ 293 and 286(c), which provides for mandatory minimum sentences for those persons who were previously convicted of certain drug-related offenses.

Here, the language of the statute speaks in the singular of an enhancement for a particular "offense," which implies a single criminal drama, not the enhancement of each of the individual scenes as set forth in the particular counts of the indictment. The notice of increased penalty also speaks of a singular enhancement for an "offense," rather than multiple "offenses," which implies the same. The language, therefore, is at least ambiguous as to whether the legislature contemplated not one but three enhancements in the same proceeding against a defendant. Ambiguous language may defeat a penalty enhancement, because "an enhanced penalty may not be imposed unless that is clearly the intent of the Legislature." *Gardner,* 344 Md. at 647, 689 A.2d at 612. Here, none has been expressed. Thus, this Court cannot affirm multiple enhancements.

The State's reliance on *Calhoun v. State,* 46 Md.App. 478, 418 A.2d 1241 (1980), *aff'd,* 290 Md. 1, 425 A.2d 1361 (1981), is misplaced. In *Calhoun* this Court addressed the question of whether Art. 27, § 643B(c), which mandates the imposition of a sentence not less than 25 years for a third conviction of a crime of violence, requires a separate 25–year sentence for *each* subsequent conviction of a violent crime in a single proceeding. Calhoun had contended that the statute was "meant to be applied once," that is, only a single penalty of 25 years without parole could be imposed, after the third conviction of any crime of violence. The Court agreed with the Calhoun. Here, the State claims that this Court compared § 643B(c) to § 293, noting that, unlike § 293, § 643B(c) did "not purport to cover third or *subsequent* offenses." *Id.* at 488–89, 418 A.2d at 1248. Section 293, on the other hand,

"provides for an enhanced punishment for a 'second or *subsequent* offense.'" *Id.* In view of the contrasting statutory language, this Court concluded, and the State quoted in its brief, "[I]t is apparent that the subsection [643B(c)] mandates the imposition of one, and only one, sentence of not less than twenty-five years upon proof of the requisite prior convictions...." *Id.* at 488, 418 A.2d at 1248. The State, however, disingenuously fails to complete the thought we expressed in that same sentence of *Calhoun,* where we referred to "requisite prior convictions *arising from separate incidents ....*" *Id.* (emphasis added). Clearly, we never intended our reference to § 293 to be so misused, and furthermore, the omitted language shows that we have anticipated the interpretation of this section which we announced herein.

The State likewise stretches beyond recognition a holding of *Gatewood,* 244 Md. at 609, 224 A.2d at 677. In *Gatewood,* the defendant previously had been convicted at least twice for violation of the lottery laws. Article 27, § 366 provided that a person convicted for a second time of any enumerated lottery offense would receive a sentence of two to five years. The defendant, who had previously been convicted of a second offense, argued that he could not be sentenced under the statute after his third offense. *Id.* at 617, 224 A.2d at 682–83. In addressing his contention, the Court of Appeals reviewed the various definitions of the word "second," noting that one common definition was "another, additional to that which has already taken place." *Id.* at 617–18, 224 A.2d at 683. The Court also pointed out that the word "time" as used in the statute was to be construed in light of the principle of Code interpretation providing that "'[t]he singular always includes the plural, and vice versa, except where such construction would be unreasonable.'" *Id.* (quoting Md.Code (1957, 1998 Repl.Vol.), Art. 1 § 8). Thus, the word "time" could properly be taken to mean "time or times." *Id.* The Court of Appeals concluded that the statute could be read to mean "that the maximum five year sentence may be given if any person shall be convicted another time or times of any lottery offense." Yet, the issue in the instant case is not so much whether the

word "offense" should be singular or plural, but rather if the word includes "count" or "all counts comprising a singular criminal episode." The statutory canon allows flexibility "where such construction would be unreasonable," which we so find.

Moreover, when we place § 293 in its context with the rest of the controlled dangerous substance statute, as *Gargliano,* 334 Md. at 436, 639 A.2d at 678, directs us to do, it appears that the scheme defines an "offense" for the purpose of enhanced penalties as one indictable criminal episode. Enhancement is not available until a subsequent episode occurs on a subsequent date. For example, § 286(d)(3) provides for enhancement against recidivists and explains that "[a] separate occasion shall be considered one in which the second or succeeding offense is committed after there has been a charging document filed for the preceding offense." This provision treats an "offense" as a course of events leading to the filing of a charging document, and it clearly implies that multiple *counts* within the same charging document are not treated as separate "offenses" for the purpose of sentence enhancement.

Additional persuasive authority from other states illuminates application of sentencing enhancements under the rule of lenity and shows that the interpretation for which appellant argues is hardly a striking one. *See, e.g., People v. Douglas,* 39 Cal.App.4th 1385, 46 Cal.Rptr.2d 534 (1995) (enhancement for kidnapping that occurred in same course of conduct as certain sexual offenses could be applied to only one of the sexual offenses to which the enhancement statute applied); *Hale v. State,* 630 So.2d 521 (Fla.1993) (when habitual offender enhancement is applied to maximum sentence for two separate counts committed during the same criminal episode, sentences must run concurrently and not consecutively), *cert. denied, Hale v. Florida,* 513 U.S. 909, 115 S.Ct. 278, 130 L.Ed.2d 195 (1994); *Fointno v. State,* 487 N.E.2d 140 (Ind.1986) (finding sentence unconstitutionally harsh where the trial court enhanced multiple counts stemming from same criminal act citing the same aggravating factors); *State v. Kennerson,* 695 So.2d 1367, 1380 (La.App.1997) ("[A] defendant cannot be

sentenced as a multiple offender on multiple counts where the convictions on more than one count were entered on the same day and the offenses arose out of a single criminal episode"); *In re Post Sentencing Review of Charles,* 135 Wash.2d 239, 955 P.2d 798 (1998) (under rule of lenity, firearms enhancements run consecutively to their underlying sentences, but in multiple counts of same offense, the enhancements do not run necessarily consecutively to each other, unless underlying sentences run consecutively).

Although illegal drugs are a cancer destroying many parts of contemporary society, and the trial and sentencing records show that appellant was a sophisticated player in that milieu, it is doubtful that the legislature intended the trial court's interpretation of § 293. We reverse the sentencing enhancements and remand to the trial court for resentencing consistent with this opinion.

## VI.

### The Presumption of Innocence

 Appellant's sixth and final assignment of error is of little merit. We thus find that the trial court did not err. The trial court denied appellant's request to instruct the jury that "the presumption of innocence alone is sufficient to acquit a defendant unless they are satisfied beyond a reasonable doubt after careful consideration of all the evidence." We find that the actual instructions given by the trial court accurately stated the law and were more than adequate under the circumstances.

Appellant took his suggested jury instructions from *Lucas v. State,* 116 Md.App. 559, 698 A.2d 1145, *cert. denied,* 348 Md. 206, 703 A.2d 148 (1997), in which this Court found that a questionable instruction on circumstantial evidence created no error, in part because the jury had been properly instructed on reasonable doubt. The "proper" reasonable doubt instruction requested by appellant here included the following passage:

Unless the prosecution has proven the accused guilty beyond a reasonable doubt based upon legal evidence presented in this case, the presumption of innocence alone is sufficient to acquit the accused.

*Id.* at 566–67, 698 A.2d at 1149. Following *Lucas,* appellant thus argues that an instruction like the one above is a correct statement of the law and the trial court was required to give such an instruction upon the request of the defendant.

In deciding whether the trial court was required to give the requested instruction or, indeed, any instruction, this Court must determine i) whether the instruction constituted a correct statement of the law; ii) whether it was applicable under the facts and circumstances of this case; and iii) whether it was fairly covered in the instructions actually given. *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344, 1348 (1984) (citing *Lansdowne v. State,* 287 Md. 232, 239, 412 A.2d 88, 91 (1980)). *See also* Md. Rule 4–325(c) ("The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.")

Here, appellant's requested instruction was superfluous. The trial court instructed the jury that appellant was presumed innocent of all crimes charged until proven guilty beyond a reasonable doubt. The trial court told the jury that appellant had come

into Court clothed in this presumption of innocence, which remains with him from the beginning until the end of trial, as though the presumption is fixed and testified to and supported by evidence that he is innocent.

The burden of proving the defendant guilty is upon the prosecution from the beginning to the end of the trial, beyond a reasonable doubt, for every element of the crimes charged. The defendant has no burden to sustain and does not have to prove his innocence.

. . .

> [I]f you feel that the State has failed to prove beyond a reasonable doubt all the facts necessary to convict, then you must acquit.

The court further explained that if the jury was not satisfied of the defendant's guilt beyond a reasonable doubt, then reasonable doubt existed, and the jury had to find the defendant not guilty.

In view of these instructions, which were repetitive in their thoroughness, it was unnecessary for the trial court to give the redundant instruction requested by appellant. The trial judge made perfectly clear to the jury that the presumption of innocence was sufficient, in and of itself, to acquit appellant, absent the State's proving his guilt beyond a reasonable doubt. Thus, appellant's assertion that the trial court failed to give "a correct statement regarding the basics of a criminal proceeding regarding the presumption of innocence and the requirement of proof beyond a reasonable doubt" is baseless. The trial court did just that, and nothing more was warranted.

Appellant's reliance on *Lansdowne v. State*, 287 Md. 232, 412 A.2d 88 (1980), is misplaced. At issue in that case was the absence of *any* explanation of the term "reasonable doubt" in the court's instructions to the jury. *Id.* at 239–40, 412 A.2d at 91–92. Although the trial court had explained the term in its preliminary remarks made at the beginning of the trial, the Court of Appeals held that preliminary remarks "do not perform the function of jury instructions," and, as such, "cannot be considered to be jury instructions." *Id.* at 243, 412 A.2d at 93. Thus, the trial judge's failure to repeat during the jury instructions the explanation of reasonable doubt given several hours earlier in the trial was tantamount to a failure to give the instruction altogether, which the Court held to be reversible error. *Id.* at 247, 412 A.2d at 96. Under the circumstances, the Court of Appeals found that the requested instruction was not fairly covered by the instructions already given.

Here, the requested jury instruction was more than fairly covered by the trial judge's other instructions explaining the presumption of innocence and the State's burden of proving appellant guilty beyond a reasonable doubt. Unlike the trial court in *Lansdowne*, the court below gave its instructions on reasonable doubt at the end of the evidence with the jury instructions. Therefore, because there already was "a correct statement of applicable law regarding reasonable doubt and the presumption of innocence," no "error" needed to be "cleanse[d]" by appellant's requested instruction.

Neither does *Lucas*, 116 Md.App. at 559, 698 A.2d at 1145, cited by appellant as the proper form of instruction, help him, for the simple reason that the State does not dispute that such an instruction is a correct statement of law. The instructions actually given by the trial court on the presumption of innocence and the reasonable doubt standard conveyed the same meaning to the jury that appellant wanted conveyed. Adding the instruction from *Lucas* would have done nothing to enlighten the jury. In summary, then, we find appellant's sixth assignment of error to be without substance. We find that the trial court did not err.

**JUDGMENT AFFIRMED IN PART REVERSED IN PART.**

**APPELLANT TO PAY 75% OF THE COSTS, MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY 25% OF THE COSTS.**